## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

LAC COURTE OREILLES BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS OF
WISCONSIN, a federally recognized Indian tribe, on
its own behalf and as *parens patriae* for its members,

Plaintiff,

LAC DU FLAMBEAU BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS OF THE LAC
DU FLAMBEAU RESERVATION OF
WISCONSIN, a federally recognized Indian tribe, on
its own behalf and as *parens patriae* for its members,

Plaintiff,

RED CLIFF BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS OF WISCONSIN, a federally
recognized Indian tribe, on its own behalf and as
*parens patriae* for its members,

Plaintiff,

BAD RIVER BAND OF LAKE SUPERIOR TRIBE
OF CHIPPEWA INDIANS OF THE BAD RIVER
RESERVATION, WISCONSIN, a federally
recognized Indian tribe, on its own behalf and as
*parens patriae* for its members,

Plaintiff,

v.

SCOTT WALKER, Governor of the State of
Wisconsin; RICHARD G. CHANDLER, Secretary of
Revenue of Wisconsin; TOWN OF BASS LAKE,
Wisconsin; TOWN OF HAYWARD, Wisconsin;
TOWN OF LAC DU FLAMBEAU, Wisconsin;
TOWN OF SANBORN, Wisconsin; TOWN OF
RUSSELL, Wisconsin; TOWN OF ASHLAND,
Wisconsin; TOWN OF WHITE RIVER, Wisconsin;
TOWN OF GINGLES, Wisconsin; TOWN OF
BOULDER JUNCTION, Wisconsin;

Court File No. 18-cv-992

TOWN OF MERCER, Wisconsin; TOWN
OF SHERMAN, Wisconsin; SCOTT
ZILLMER, Assessor; WILLIAM
MIETZINGER, Assessor; MICHAEL
SCHNAUTZ, Assessor; CLAUDE
RIGLEMON, Assessor; ASSOCIATED
APPRAISAL CONSULTANTS, INC.
Assessor; PAUL CARLSON, Assessor;
JENNIE MARTEN Assessor,

                Defendants.

---

## Complaint for Declaratory and Injunctive Relief

---

       Plaintiffs Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad
River Reservation, Wisconsin (the "Bad River Band"), Lac Courte Oreilles Band of Lake
Superior Chippewa Indians of Wisconsin (the "Lac Courte Oreilles Band"), Lac du Flambeau
Band of Lake Superior Chippewa Indians of Wisconsin (the "Lac du Flambeau Band"), and Red
Cliff Band of Lake Superior Chippewa Indians of Wisconsin (the "Red Cliff Band")
(collectively, the "Tribes"), on their own behalf and as *parens patriae* for their members, by and
through their counsel, state and allege as follows:

## INTRODUCTION

       1.      The Tribes bring this civil action for declaratory and injunctive relief in response
to the unlawful actions of the above-named defendants to assess, collect, and enforce taxes under
Chapter 70 of the Wisconsin Statutes upon properties owned in fee simple by the Tribes and their
members within the exterior boundaries of the Lac Courte Oreilles Reservation, the Lac du
Flambeau Reservation, the Bad River Reservation, and the Red Cliff Reservation (the
"Reservation Fee Lands" within the collective "Reservations"). The Defendants' actions violate:
(1) the Treaty with the Chippewa, 10 Stat. 1109 (1854) (the "1854 Treaty"), which set aside

reservations as permanent homes for the Tribes and guaranteed that they would never be removed therefrom; (2) federal common-law that precludes state taxation of land owned by Indian tribes and tribal members within Indian reservations absent unmistakably clear congressional authorization; and (3) the Nonintercourse Act, 25 U.S.C. § 177, which preempts state taxing jurisdiction over lands owned by an Indian tribe.

2.     In this civil action, the Tribes seek a declaration that the Defendants do not possess the authority to tax the Reservation Fee Lands and an injunction preventing the assessment, imposition, or collection of those taxes.

## **PARTIES**

3.     The Bad River Band is a successor to the signatory bands of the 1854 Treaty. It exercises jurisdiction over its reservation, created by the second paragraph of Article II of the 1854 Treaty, which includes more than 124,000 acres of land in six townships.

4.     The Lac Courte Oreilles Band is a successor to the signatory bands of the 1854 Treaty. The 1854 Treaty established its reservation, equal to three townships, to be set aside for the Band. The reservation was selected in 1859. The area was surveyed in 1863 and 1865, and the reservation was formally declared in 1873.

5.     The Lac du Flambeau Band is a successor to the signatory bands of the 1854 Treaty. The third paragraph of Article II of the 1854 Treaty established its reservation of three townships.

6.     The Red Cliff Band is a successor to the signatory bands of the 1854 Treaty. It occupies a reservation on the shores of Lake Superior that encompasses approximately 14,541 acres. The Red Cliff Reservation includes land designated for Chief Buffalo's band under Article II, Section 6 of the 1854 Treaty, which was set apart and withdrawn from sale by the General

Land Office by order of President Franklin Pierce in February 21, 1856, as well as land reserved

and withdrawn from sale in 1863 at the request of the Commissioner of Indian Affairs, and later

explicitly confirmed to be part of the Red Cliff Reservation by Congress, Joint Resolution, 28

Stat. 970 (1895).

7.      Defendant Scott Walker is the Governor of the State of Wisconsin. He is the head

of the State's executive branch, and as such, he is responsible for the overall adoption and

administration of State agency policies and for execution of laws within the State, including

within the State's counties, townships, and other municipalities, all of which are creatures of the

State and act through the State's delegated authority. The Tribes sue Governor Walker in his

official capacity.

8.      Defendant Richard G. Chandler is Secretary of the Wisconsin Department of

Revenue (the "Department"), and he has served in that position since January 2011, when he was

appointed by Governor Walker. The Department is an agency formed under the laws of the State

of Wisconsin. It possesses the duty to exercise general supervision over the administration of the

assessment and tax laws of the State of Wisconsin, including Chapter 70 (General Property

Taxes) of the Wisconsin Statutes. The Department also has the duty to direct, advise, and

supervise the work of assessors, boards of review, and county boards of assessments in matters

relating to the taxation of real property within the State. Wis. Stat. §§ 73.03, 73.06. Secretary

Chandler is the highest-ranking official in the Department. The Tribes sue Secretary Chandler in

his official capacity.

9.      Defendant Town of Sanborn is located in Ashland County and is a political

subdivision of the State of Wisconsin with a Town Hall address of 69393 U.S. Highway 2,

Ashland, WI 54806.  The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

10.     Scott Zillmer of Zillmer Midstate Assessment is the assessor for the Town of Sanborn. His address is 610 Bertram Street, Marion, Wisconsin 54950. As the assessor, Mr. Zillmer is responsible for identifying the real and personal property subject to taxation or otherwise exempt and determining the value of that property.

11.     Defendant Town of Ashland is located in Ashland County and is a political subdivision of the State of Wisconsin with a Town Hall address of 39227 State Highway 13, Highbridge, Wisconsin 54846.  The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

12.     William Metzinger is the assessor for the Town of Ashland. His address is 1202 13th Street West, Ashland, Wisconsin 54806. As the assessor, Mr. Metzinger is responsible for identifying the real and personal property subject to taxation or otherwise exempt and determining the value of that property.

13.     Defendant Town of White River is located in Ashland County and is a political subdivision of the State of Wisconsin with a Town Hall address of 61939 State Highway 112, Ashland, Wisconsin, 54806. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

14.     Michael Schnautz is the assessor for the Town of White River. His address is P.O. Box 47, Clam Lake, Wisconsin 54517. As the assessor, Mr. Schnautz is responsible for identifying the real and personal property subject to taxation or otherwise exempt and determining the value of that property.

15.     Defendant Town of Gingles is located in Ashland County and is a political subdivision of the State of Wisconsin with a Town Hall address of 49833 State Highway 112, Ashland, Wisconsin, 54806. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

16.     Defendant Town of Bass Lake is located in Sawyer County and is a political subdivision of the State of Wisconsin with a Town Hall address of 14412 W County Hwy K Hayward, WI 54843. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

17.     Claude Riglemon is the assessor for the Town of Bass Lake. His address is 21716 Aspen Avenue, Warren, Wisconsin 54666. As the assessor, Mr. Riglemon is responsible for identifying the real and personal property subject to taxation or otherwise exempt and determining the value of that property.

18.     Defendant Town of Hayward is located in Sawyer County and is a political subdivision of the State of Wisconsin with a Town Hall address of 15460W, State Road 77E, Hayward, Wisconsin 54843. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

19.     Associated Appraisal Consultants, Inc. is the assessor for the Town of Hayward and the Town of Gingles. Its main corporate office is located at 1314 W. College Ave., Appleton, Wisconsin 54914, and it receives mail at P.O. box 342, Hurley, Wisconsin 54524. As the assessor, Associated Appraisal is responsible for identifying the real and personal property subject to taxation or otherwise exempt and determining the value of the property.

20.      Defendant Town of Lac du Flambeau is located in Vilas County and is a political subdivision of the State of Wisconsin with a Town Hall address of 109 Old Abe Road, Lac du

Flambeau, Wisconsin. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

21.     Defendant Town of Boulder Junction is located in Vilas County and is a political subdivision of the State of Wisconsin with a Town Hall address of 5392 Park Street, Boulder Junction, Wisconsin 54512. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

22.     Defendant Town of Mercer is located in Vilas County and is a political subdivision of the State of Wisconsin with a Town Hall address of 2657W Railroad Street, Mercer, Wisconsin 54547. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

23.     Defendant Town of Sherman is located in Vilas County and is a political subdivision of the State of Wisconsin with an address of W3063 State Trunk Hwy 182, Park Falls, Wisconsin 54552. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

24.     Paul Carlson is the assessor for the Towns of Lac du Flambeau, Boulder Junction, Mercer, and Sherman. His address is: Carlson Appraisal, 8495 Pardee Lake Lane, Presque Isle, WI 54557

25.     Defendant Town of Russell is located in Sawyer County and is a political subdivision of the State of Wisconsin with an address of 35900 State Highway 13, Bayfield, Wisconsin 54814. The Town is responsible for collecting *ad valorem* taxes on real property within its jurisdiction.

26.     Jennie Marten of Badgerland Appraisal is the assessor for the Town of Russell. Her address is 639 Summit Avenue, Chippewa Falls, Wisconsin 54727. As the assessor, Ms.

Martin is responsible for identifying the real and personal property subject to taxation or otherwise exempt and determining the value of that property.

## JURISDICTION

27.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1362 (federal-question action brought by an Indian tribe).

28.     Each of the Tribes maintains a government-to-government relationship with the United States and has a governing body that is duly recognized by the Secretary of the Interior. Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 83 Fed. Reg. 34,863 (July 23, 2018).

29.     This action arises under the U.S. Constitution and federal laws, including but not necessarily limited to the Treaty with the Chippewa, 10 Stat. 1109 (1854), the Supremacy Clause of the United States Constitution, art. VI § 2, the Nonintercourse Act, 25 U.S.C. § 177, the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2201, and federal common law.

30.     This Court possesses jurisdiction to issue injunctive relief under its equitable powers because no other remedy at law exists to stop officials within the State of Wisconsin from continuing to unlawfully deprive the Tribe of its treaty-protected rights.

31.     The Court has personal jurisdiction over the Defendants because they reside in the State of Wisconsin and exercise their official authority within the State.

32.     The sovereign immunity of the State does not deprive this Court of jurisdiction over Defendants Governor Walker and Secretary Chandler, who are acting in violation of federal law. *See Ex parte Young*, 209 U.S. 123, 160 (1908) (holding that "[t]he state has no power to impart . . . any immunity from responsibility to the supreme authority of the United States").

8

33.    The sovereign immunity of the State does not extend to local units of government, and therefore, the Defendant Towns are not protected by such immunity.

34.    Local governmental immunity does not deprive this Court of jurisdiction over Defendant Towns, who lack any discretion to violate federal treaty rights.

35.    Local governmental immunity does not deprive this Court of jurisdiction over Defendant Assessors, who are acting in violation of federal law.

## VENUE

36.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because one or more of the Defendants resides in this judicial district, a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and the property that is the subject of the action is situated on the Tribes' Reservations, which are within this judicial district.

## LEGAL OVERVIEW

37.    The United States Supreme Court has adopted a "categorical approach" to state taxation of Indian tribes, tribal members, and their property, within Indian country. *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995). State taxation is precluded unless Congress has "made its intention to [authorize state taxation] unmistakably clear." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 765 (1985); *Chickasaw Nation*, 515 U.S. at 459 (holding that there must be "clear congressional authorization" for state taxation). The burden of proof lies with the state to demonstrate that Congress authorized the tax in question.

38.    Indian country includes all land within an Indian reservation, regardless of whether that land is held in trust by the United States or in fee simple by an Indian tribe or one of its members. 18 U.S.C. § 1151(a); *DeCoteau v. District Cty Court for the Tenth Judicial Dist.*, 420 U.S. 425, 427 n.2 (1975) (noting that "while § 1151 is concerned, on its face, only with

criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction"). Thus, a state may not tax fee lands owned by an Indian tribe or tribal member within reservation boundaries unless Congress has authorized such taxation with unmistakably clear language.

39.     On many Indian reservations, land that was held in common by the tribe was allotted to individual tribal members under the General Allotment Act of 1887, ch. 119, 24 Stat. 388, *codified as amended,* 25 U.S.C. §§ 331 *et seq.* Individual allotments were then held by the United States in trust for a period of time. After that time elapsed, the tribal-member-owner was given a patent in fee simple absolute to the land, and an amendment to the General Allotment Act clarified that "all restrictions as to sale, incumbrance, or taxation of said land shall be removed" upon issuance of the patent. 25 U.S.C. § 349. In *County of Yakima v. Confederated Tribes and Bands of the Yakima Nation,* the Supreme Court held that this language provided unmistakably clear authorization for states to tax land that had passed into fee simple absolute status as a result of this statutory scheme. 520 U.S. 251,259 (1992); *see also Cass County v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 113 (1998) (holding that when Congress passed the Nelson Act of 1889, 25 Stat. 642, which implemented the General Allotment Act on certain reservations in Minnesota, it clearly intended for state taxation of surplus lands that were open to sale by non-Indians for timber or agricultural purposes).

40.     The Tribes' Reservations were not allotted under the General Allotment Act or its amendments. Rather, the Reservations were allotted under the 1854 Treaty and statutes implementing that Treaty. *See, e.g.*, *Indian Lands-Allotments-Patent-Act of February 8, 1887, Lac de Flambeau Indians,* 9 Land Dec. 392 (Sept. 23, 1889) (Assistant U.S. Attorney General opinion concluding that land on the Lac du Flambeau Reservation should continue to be allotted

pursuant to the terms of the 1854 Treaty, and that the General Allotment Act was inapplicable to the reservation).

41.     Indian treaties are construed differently from statutes. "A treaty is in its nature a contract between nations," rather than an ordinary "legislative act." *Lozano v. Montoya Alvarez,* 572 U.S. 1, 12 (2014) (quotation omitted). As a result, the terms of a treaty must be interpreted "as the Indians themselves would have understood them." *Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 196 (1999). Additionally, any ambiguities must be resolved in favor of the tribe, and the terms of a treaty must be liberally construed in favor of preserving Indian rights. *Id.* at 200. These canons of constructions are necessary because the tribal negotiators often could not understand (*i.e.,* speak, read, or write) English, yet the treaty was drafted by the United States and negotiated using translators chosen by the United States. *See Washington v. Washington State Commercial Passenger Fishing Vessel,* 443 U.S. 658, 667 n.10, 675-76 (1979) (noting that the American negotiators possessed "superior knowledge of the language in which the treaty [wa]s recorded" and describing the severe translation difficulties in the negotiation of treaties). These rules are also derived from "the unique trust relationship between the United States and the Indians." *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247 (1985).

42.     Indian treaties are the supreme law of the land. U.S. Const. art. VI, cl. 2 ("[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . . ."). While Congress can unilaterally abrogate Indian treaties, it must "clearly express its intent to do so." *Mille Lacs*, 526 U.S. at 202. Express statutory language is preferred. *United States v. Dion*, 476 U.S. 734, 739 (1986) (noting that an "[e]xplicit statement by Congress is preferable for the

purpose of ensuring legislative accountability for the abrogation of treaty rights"). Where such language is absent, there must be "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *Id.* at 740. Additionally, because treaty rights create recognized property interests protected by the Fifth Amendment to the United States Constitution, if Congress abrogates those rights, just compensation is due. *United States v. Sioux Nation of Indians*, 448 U.S. 371, 408-09 (1980).

43.     When a reservation is allotted under the terms of a treaty, state taxation of Indian lands is only permitted if it is authorized by the treaty itself or if Congress has demonstrated unmistakably clear intent to authorize the tax. Furthermore, if a treaty not only creates a reservation but also protects tribal property within the reservation from state taxation, that protection can only be abrogated if Congress knew of it and chose to abrogate it through legislation.

44.     The 1854 Treaty protects reservation land owned by the Tribes and their members in fee simple absolute from state property taxes. Congress has not authorized the taxation of fee simple property owned by the Tribes and their members within the Reservations, and Congress has not abrogated the Tribes' treaty protection from taxation. *See, e.g.*, *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514, 530-33 (6th Cir. 2006) (holding that neither the 1854 Treaty nor any federal statutes authorized Michigan to tax reservation lands held by the Keweenaw Bay Indian Community and its members in fee simple absolute within its treaty-created reservation).

45.     The Defendants have been wrongfully directing, assessing, collecting, and imposing, and upon information and belief, intend to continue to wrongfully direct, assess,

collect, and impose property taxes on Reservation Fee Lands under Chapter 70 of the Wisconsin Statutes.

## FACTUAL BACKGROUND

46.     The Ojibwe Indians of present-day Wisconsin are descendants of northern Algonquian people who lived in the Great Lakes region for hundreds of years before Europeans arrived in the area. In the early nineteenth century, large Ojibwe villages existed at numerous locations including at La Pointe on Madeline Island and inland at Lac Courte Oreilles and Lac du Flambeau. More than a dozen smaller villages existed along the south shore of Lake Superior and interior waterways. These Indians came to be known by American officials as the Lake Superior Chippewa.

47.     Politically, the band was the largest unit of Ojibwe society. Bands were territorially based, cooperative groups of intermarried families that varied in size from 50 to 250 people. Each band had a civil chief (ogema) who was recognized for his generosity and wisdom. But decisions were made collectively by consensus; chiefs had no power to make binding decisions for others.

48.     Historically, the Ojibwe followed a pattern of seasonal movement (commonly referred to as the "seasonal round") within their band territories, moving from one resource to the next as it became available. Families congregated in the largest numbers during the summer months, when they formed villages on the shores of lakes and rivers. They fished and hunted near the villages, collected wild plants, and planted corn, beans and squash. In the late summer wild rice was harvested, while the late fall was fishing season along the Great Lakes and large interior lakes. After fall fishing, the villages broke up and families departed for southern hunting territories where white-tailed deer and elk were more abundant. When winter set in, families

13

made their way back north. By early spring, they were tapping trees to make maple sugar, hunting pigeons and migratory birds, harvesting wild potatoes, and, later, picking berries. In the late spring, spawning fish made it possible for families to congregate again along the waterways.

49.     During the first two decades of the nineteenth century the United States had little influence over the Wisconsin Ojibwe. Few white settlers ventured into northern Wisconsin during this time period, and the United States Indian agencies were located at Fort Snelling, Sault Ste. Marie, and Mackinac, far away from the Wisconsin Ojibwe.

50.     The first treaty negotiations the Wisconsin Ojibwe participated in were the 1825 negotiations for the Treaty of Prairie du Chien. Treaty with the Sioux, 7 Stat. 272 (1825). Federal treaty commissioners William Clark and Lewis Cass assembled 3,000 Indians representing the Ojibwe, Winnebago, Menominee, Dakota, Sac, Fox, Iowa, Ottawa, Potawatomi, and Illinois. The United States claimed that a treaty would promote peace among the tribes by establishing boundaries between them. In fact, the United States intended to use these negotiated boundaries to facilitate future land cessions, by resolving historical territorial disputes between tribal groups and ensuring that the United States need only purchase the land from one group. In the Treaty of Prairie du Chien, the Dakota and Ojibwe agreed upon a boundary line between their territories in Minnesota and Wisconsin.

51.     Many of the Lake Superior bands, including many Wisconsin Ojibwe bands, were not represented fully at the Treaty of Prairie du Chien. Therefore, at the insistence of tribal negotiators, Article 12 of the treaty required negotiation of another treaty where the Lake Superior bands would be adequately represented. Lewis Cass and Thomas McKenney were the federal negotiators for the subsequent treaty, which concluded on August 5, 1826 at Fond du Lac. Treaty with the Chippewa, 7 Stat. 290 (1826) (the "1826 Treaty"). The 1826 Treaty stated

that the signatory bands "fully assent[ed]" to the Treaty of Prairie du Chien. It also included a new provision giving "the United States the right to search for, and carry away, any metals or minerals" from a section of Ojibwe country, while providing that "this grant [wa]s not to affect the title of the land, nor the existing jurisdiction over it." *Id*. at art. I & III.

52.     By the 1830s, the federal government's Indian policy focused on securing treaty land cessions, removing Indians from the ceded lands, and encouraging non-Indian settlement on the ceded lands. The Indian Removal Act of 1830, ch. 148, 4 Stat. 411, called for the "voluntary" exchange of lands east of the Mississippi River for lands in an area west of Arkansas and Missouri, which were designated as Indian Country.

53.     The removal policy was applied to Indians in the Great Lakes region. By the mid-1830s, removal treaties had opened large portions of present-day southern Wisconsin to white settlement, and American policymakers began to consider purchasing Ojibwe lands in the northern part of the state.

54.     Congress established the Territory of Wisconsin on April 20, 1836, *see* Act Establishing the Territorial Government of Wisconsin, ch. 54, 5 Stat. 10 (1836), and Henry Dodge was appointed Wisconsin Territorial Governor and *ex officio* Superintendent of Indian Affairs. Governor Dodge and American lumber interests lobbied Congress for a treaty that would provide access to more land and timber resources in the Wisconsin Territory.

55.     In late June 1837, over 1,000 Chippewa assembled at Fort Snelling for treaty negotiations, which commenced on July 20th and lasted 10 days. The Lake Superior Chippewa who occupied the territory ultimately ceded were not present for the first several days of negotiations.

56.     In the final treaty, the Ojibwe ceded a vast land base in central Minnesota and north-central Wisconsin in exchange for 20 years of annuities, which totaled $700,000 in money and goods. Treaty with the Chippewa, arts. I & II, 7 Stat. 536 (1837) (the "1837 Treaty").

57.     Tribal negotiators for the 1837 Treaty did not read, write, or speak English; they relied on the translators chosen by federal officials. The United States, however, chose interpreters that were not well versed in both Ojibwe and English, and there were significant difficulties with accurately interpreting the negotiations and the treaty.

58.     Many of the tribal negotiators believed that they were simply providing the United States the opportunity to cut down trees in the area. Federal negotiators led them to believe that white settlers did not want the land because it was not suited for agriculture and that additional negotiations would occur if the United States desired the land in the future.

59.     Tribal negotiators insisted that they be allowed to continue to use the land as they had always done—using the seasonal round—and they believed that they had secured that right in the 1837 Treaty.

60.     There was no discussion during the negotiation of the 1837 Treaty and nothing in the treaty itself that states or implies that the federal government intended to remove the Lake Superior Chippewa. Rather, during the negotiations, the Ojibwe were promised that they could remain in the ceded territory and continue their traditional way of life.

61.     Article V of the 1837 Treaty provided that "[t]he privilege of hunting, fishing and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States."

62.     In *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, the U.S. Court of Appeals for the Seventh Circuit held that the usufructuary rights contained in

Article V of the 1837 Treaty could be revoked by the President "*only* if the Indians misbehaved by harassing white settlers," because this is how the provision was understood by the tribal negotiators. 700 F.2d 341, 361 (7th Cir. 1983) (emphasis in original).

63.     In 1842, the United States sought to obtain access to the copper and iron deposits in northern Michigan. To achieve that goal, it negotiated another treaty, whereby the Ojibwe ceded a vast territory between Lake Superior and the Mississippi River, including land in what is now the Upper Peninsula of Michigan and northern Wisconsin. Treaty with the Chippewa, art. II, 7 Stat. 591 (1842) (the "1842 Treaty").

64.     Tribal negotiators for the 1842 Treaty did not read, write, or speak English; they relied on the translators chosen by federal officials. The United States, however, chose interpreters that were not well versed in both Ojibwe and English, and there were significant difficulties with accurately interpreting the negotiations and the treaty.

65.     Many of the tribal negotiators believed they had relinquished only their mineral rights under the 1842 Treaty. Federal negotiators led the Tribes to believe that they could remain on their land and continue to use it as they had before, as long as they remained peaceful.

66.     Article II of the 1842 Treaty provided that "the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress."

67.     Article II of the 1842 Treaty also stated that the Indians retained "the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States." When tribal negotiators expressed unwillingness to sign the treaty with a provision referencing removal, federal officials promised them that the government would not want the land for a very long time, if ever.

68.     Despite these promises, not long after executing the 1842 Treaty, federal officials began seeking to remove the Wisconsin Ojibwe to Minnesota.

69.     Powerful politicians, including Minnesota Territorial Governor Alexander Ramsey and Senator Henry Rice advocated for removal of the Wisconsin Ojibwe so the Minnesota Territory could benefit from the secondary economic gains associated with having Indian agency officials and annuity payments paid within its limits.

70.     On February 6, 1850, President Zachary Taylor issued an executive order purporting to cancel the usufructuary rights granted by the 1837 and 1842 Treaties and directing the removal of the Ojibwe from the ceded territories.

71.     Federal officials attempted to trick the Wisconsin Ojibwe into removing by relocating the 1850 annuity payment to Sandy Lake, within the Minnesota Territory, and then delaying distribution of that payment until the waterways had frozen, hoping to thus prevent the return of tribal members to their winter villages. Hundreds of Wisconsin Ojibwe died of disease, exposure, and starvation while waiting for the annuity payment to be made at Sandy Lake and during their return to their winter villages.

72.     In 1851, the Acting Commissioner of Indian Affairs wrote to the Secretary of the Interior to inform him that while there were more than 1,000 Ojibwe assembled at La Pointe, they could not be removed from the ceded territory without the use of force. He requested the Secretary's approval to suspend removal efforts. Two days later, on August 25, 1851, the Secretary suspended the removal efforts until a final determination could be made by the President of the United States. Despite this suspension, many federal officials, including Governor Ramsey, continued to advocate for removal of the Wisconsin Ojibwe.

73.     The U.S. Supreme Court has held that the 1850 Removal Order exceeded the authority of the President and was void *ab initio*. *Mille Lacs*, 526 U.S. at 188-95 (concluding that the 1850 Removal Order was unauthorized and void in its entirety); *see also Lac Courte Oreilles*, 700 F.2d at 362 (holding the "the 1850 Order exceeded the scope of the 1837 and 1842 treaties and was therefore invalid").

74.     The bands of Wisconsin Ojibwe that today make up the Tribes fought for the right to remain in their homeland and they were never removed.

## THE 1854 TREATY OF LAPOINTE

75.     In the early 1850s, the United States abandoned its general policy of removing Indian tribes westward. By this time, the United States had already acquired, and U.S. citizens had already settled, land along the Pacific Coast. Consequently, the United States could no longer remove tribes west of white settlements.

76.     When the United States shifted its Indian policy away from removal, it focused on the creation of Indian reservations within tribes' historic territories.

77.     George Manypenny, the Commissioner of Indian Affairs from 1853-1857, was the primary architect of the early reservation policy. Manypenny believed that reservations should be set aside as "permanent homes" for tribes. By concentrating Indians in smaller areas, it was believed that they would be protected from the onslaught of non-Indian settlement and the bad influences of white traders and settlers (*e.g.*, liquor traffic), and they could be more easily provided services by the federal government and missionaries, all of which was supposedly key to their "civilization." From the outset, Commissioner Manypenny was a strong advocate for allotting reservations to individual Indians because cultivating family farms was considered an important way to teach American values.

78.     In 1848-49, a delegation of Lake Superior Chippewa had traveled to Washington, D.C. to ask federal officials to set aside 24 reservations for them in the territories they ceded under the 1837 and 1842 Treaties. The delegation presented their requests through drawn images and written words, the latter with the assistance of John Martell, who served as the delegation's interpreter. Martell informed federal officials that the Lake Superior Chippewa sought "land from our Great Father, the President, as will cover the above described places and be sufficient for a permanent home for each of our Bands forever, which lands we wish to be conveyed to the Head Chiefs of each band and to their rightful successors forever, and not be transferable or subject to incumberance [sic] for debt." Federal officials did not act on this request.

79.     In 1852, another delegation of Lake Superior Chippewa, led by Chief Buffalo (Pishake), and with Benjamin Armstrong acting as an interpreter, traveled from La Pointe, Wisconsin to Washington, D.C. The delegation requested that removal efforts cease and that the Lake Superior Chippewa be allowed to permanently remain on reservations within their homelands.

80.     By 1854, the United States was anxious to obtain the rich iron deposits west of Lake Superior, which are now known as the Mesabi and Vermillion iron ranges.

81.     Federal officials had previously tried to negotiate a treaty with the Lake Superior Chippewa in 1847 to obtain a cession of land west of Lake Superior. But the Ojibwe did not want to cede this land and refused to do so for anything less than one million dollars. Federal negotiators were not authorized to offer such a sum, and the land was not ceded at that time.

82.     Commissioner of Indian Affairs Manypenny acknowledged in his Annual Report to Congress in 1854 that the Lake Superior Chippewa were "very unwilling to relinquish their present residences" and that it would be "necessary to permit them all to remain in order to

acquire a cession of a large tract of country they still own east of the Mississippi which on account of its great mineral resources, it is an object of material importance to obtain."

83.     In August 1854, Commissioner Manypenny directed Indian Agents Henry Gilbert and David Herriman to negotiate a treaty with the Ojibwe for a cession of lands in Minnesota and Wisconsin, including the valuable mineral lands west of Lake Superior. He authorized them to offer up to $500,000 for the land and to permit the Lake Superior Chippewa to obtain reservations of land for their "permanent homes." While he offered his views on the reservation selection process, he noted that, if necessary, the agents should "accede to their wishes to a reasonable extent in this particular."

84.     More than 4,000 Ojibwe were present for the treaty negotiations in September 1854. This time, individuals who were knowledgeable in Ojibwe and English, including Benjamin Armstrong and George Johnston, were present.

85.     On September 30, 1854, the United States and Lake Superior Ojibwe bands in Minnesota, Wisconsin, and Michigan executed the Treaty with the Chippewa, 10 Stat. 1109 (1854) (the "1854 Treaty"), attached as Exhibit A. Under the terms of the 1854 Treaty, the Ojibwe ceded more than seven million acres in northeastern Minnesota. In consideration for that cession, the United States promised to provide permanent reservations for their benefit.

86.     In October 1854, Agent Gilbert transmitted the 1854 Treaty to Commissioner Manypenny. In the transmittal letter, Gilbert stated:

> We found that the points most strenuously insisted upon by them [the Lake Superior Chippewa band leaders] were first the privilege of remaining in the country where they reside and next the appropriation of land for their future homes. Without yielding these two points, it was idle for us to talk about a treaty. We therefore agreed to the selection of lands for them in territory heretofore ceded.

Henry Gilbert to George Manypenny, Oct. 17, 1854, National Archives and Records Service, Documents Relating to the Negotiation of Ratified and Unratified Treaties with Various Indian Tribes, 1801-69, Record Group 75, T494, Roll 5.

87.     Article II of the 1854 Treaty, which set aside permanent reservations for the Lake Superior Chippewa, provides, in relevant part, that:

> The United States agree to set apart and withhold from sale, for the use of the Chippewas of Lake Superior, the following-described tracts of land, viz:
>
> . . . .
>
> 2d. For the La Pointe band, and such other Indians as may see fit to settle with them, a tract of land bounded as follows: Beginning on the south shore of Lake Superior, a few miles west of Montreal River, at the mouth of a creek called by the Indians Ke-che-se-be-we-she, running thence south to a line drawn east and west through the centre of township forty-seven north, thence west to the west line of said township, thence south to the southeast corner of township forty-six north, range thirty-two west, thence west the width of two townships, thence north the width of two townships, thence west one mile, thence north to the lake shore, and thence along the lake shore, crossing Shag-waw-me-quon Point, to the place of beginning. Also two hundred acres on the northern extremity of Madeline Island, for a fishing ground.
>
> 3d. For the other Wisconsin bands, a tract of land lying about Lac De Flambeau, and another tract on Lac Court Orielles, each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President.
>
> . . . .
>
> 6th. The Ontonagon band and that subdivision of the La Pointe band of which Buffalo is chief, may each select, on or near the lake shore, four sections of land, under the direction of the President, the boundaries of which shall be defined hereafter. And being desirous to provide for some of his connections who have rendered his people important services, it is agreed that the chief Buffalo may select one section of land, at such place in the ceded territory as he may see fit, which shall be reserved for that purpose, and conveyed by the United States to such person or persons as he may direct.

88.     Allotment of the reserved lands was permitted pursuant to Article III, which stated:

The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations, respecting the disposition of the lands in case of the death of the head of a family, or single person occupying the same, or in case of its abandonment by them.

89.     Article XI of the 1854 Treaty unequivocally promised that "the Indians shall not be required to remove from the homes hereby set apart for them."

90.     At the time that the 1854 Treaty was negotiated, the United States treated Indian tribes as independent sovereigns, immune from state jurisdiction. Similarly, at the time the 1854 Treaty was negotiated, the United States viewed individual tribal members as subject to the jurisdiction of their tribes and under the protection of the federal government; such Indians and their property were beyond the jurisdiction of state laws, including state taxation, unless specifically agreed to in a treaty with the United States.

91.     The 1854 Treaty does not authorize the imposition of state taxes of any kind on the property of the Tribes located within the Reservations created therein. None of the historical documents relating to the negotiation of the 1854 Treaty indicate that the Indians were told that the lands reserved for them by the 1854 Treaty would be subject to state property taxes.

92.     The foremost concern for the Lake Superior Chippewa in negotiating the 1854 Treaty was to eliminate removal fears by securing permanent homelands for themselves and future generations, in perpetuity.

93.     At the time the 1854 Treaty was negotiated, neither the Tribes nor their members owned fee lands within the State of Wisconsin. The Tribes' signatories to the 1854 Treaty did not understand the concept of state property taxation.

94.     At the time of the 1854 Treaty, no more than perhaps a few members of the signatory Tribes could read or write in English.

95.     All available historical evidence indicates that at the time of the 1854 Treaty negotiations, the Tribes would never have agreed to a treaty provision authorizing the taxation of reservation lands. Tribal members did not have the resources to pay taxes, and failure to pay taxes could result in their involuntary removal from the reservation. *See, e.g.*, *Naftaly*, 452 F.3d at 524-25 (discussing the Indian understanding of Article 11 of the 1854 Treaty and concluding that "the treaty disallowed involuntary state tax sales, and thus state taxation, of real property held by Plaintiff or its members").

96.     In 1864, tribal representatives sent a petition to federal officials detailing their understandings of the 1837, 1842, and 1854 Treaties and describing their grievances in the implementation of those treaties. This document, commonly referred to as *The Statement Made by the Indians*, indicates that tribal negotiators understood the 1854 Treaty to have permanently secured their reservations and prevented them from ever being removed therefrom. Additionally, the Lake Superior Chippewa believed that they could choose to allow others (*i.e.*, mixed bloods or whites) to live among them, but that they could revoke such permission at any time. In describing what they were told, the chiefs stated the following:

> You shall reserve the lands you are inhabiting, there you shall live as long as there is one Indian left. Then you will never be removed from your reservation, nor never be ordered to leave it.

> For the sake of your Graves, you was not willing to remove when your Great Father ordered you through [Indian Agent] Watrous, which was for all the Indians.

> Your Mixed Bloods are expelled from your Villages and Reservations. . . .

> . . . .

[But] Commissioner Manypenny also told us at Lapointe, those Mixed Bloods who are living on your Reservations and whom you like and wish them to stay, can remain with you always.

There is also a White Man living on our Reservation. Manypenny tell us also in regard to him, as long as you are satisfied for him to stay he might, but the moment you wish him to go he would go.

## IMPLEMENTATION OF 1854 TREATY

97.     The reservations described in Article II of the 1854 Treaty were surveyed, withdrawn from sale, and reserved for Indian purposes in the decades following the treaty's ratification. From time to time thereafter, the President assigned parcels of reservation land to individual members of the Tribes, as contemplated by Article III of the 1854 Treaty.

98.     The Red Cliff Reservation was created by Article II, Section 6 of the 1854 Treaty, which stated: "[t]hat subdivision of the La Pointe band of which Buffalo is chief, may each select, on or near the lake shore, four sections of land, under the direction of the President, the boundaries of which shall be defined hereafter." Soon after the 1854 Treaty was ratified, however, the United States realized that far more than four sections of land—the equivalent of 2,560 acres or four-square miles of land—would be necessary for Chief Buffalo's band. As a result, at the recommendation of the Commissioner of Indian Affairs, President Pierce withdrew approximately 30,000 acres from the public domain in February 1856. Executive Order of Feb. 21, 1856, 1855 WL 10398.

99.     Due to various delays, including the need to survey the withdrawn lands, it was not until 1878 that the four sections of land described under Article II, Section 6 of the 1854 Treaty were finally patented to 32 Red Cliff tribal members. Each of these patents stated on their face that they were issued "as contemplated by the Treaty concluded September 30, 1854, with

the Chippewa Indians of Lake Superior and the Mississippi" and that they were authorized by "the President in accordance with the provisions of the 3d Article of said Treaty."

100.    The 32 patents issued to Red Cliff tribal members in 1878 were "restricted fee patents"; they were issued in the name of the allottee and to his heirs "forever," but the patent stated that the allottee "and his heirs shall not sell, lease, or in any manner alienate said Tract without the consent of the President of the United States." Exhibit B (sample Red Cliff patent).

101.    There were many Red Cliff tribal members who did not receive patents in 1878 because there was not enough land. In 1895, Congress passed a joint resolution that made some of the additional lands withdrawn by President Pierce in 1856 part of the Red Cliff Reservation. The Joint Resolution also authorized the land to be allotted under to the 1854 Treaty:

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the lands . . . in Bayfield County, Wisconsin, withdrawn from sale or location for the purpose of an enlargement of the Red Cliff Indian Reservation in said county . . . and they hereby are, declared to be a part of said Indian reservation as fully and to the same effect as if they had been embraced in and reserved as a part of said Red Cliff Reservation by the provisions of the treaty with the Chippewas of Lake Superior dated September thirtieth, eighteen hundred and fifty-four; and said lands shall be allotted to the members of the Red Cliff band of said Chippewas of Lake Superior in accordance with the provisions of said treaty: *Provided*, That the President of the United States in making allotments may divide said lands between said Indians in such manner as will in his judgment be the most equitable.

Joint Resolution, 28 Stat. 970 (1895) (emphasis added).

102.    This expansion added approximately 11,500 acres to the Red Cliff Reservation, which consequently totaled approximately 14,000 acres. Under to the 1895 Joint Resolution, this land was allotted to in 1896 to approximately 170 additional Red Cliff tribal members. Like the prior allotments, these patents all indicated that they were issued by "the President, in accordance with the provisions of the 3d Article of [the 1854 Treaty]," and allottees and their heirs were

directed that they "shall not sell, lease or in any manner alienate, said tract without the consent of the President of the United States." Exhibit C (sample patent).

103.    There was some confusion when allotting land on the Bad River, Lac Courte Oreilles, and Lac du Flambeau Reservations. In the early twentieth century, federal officials charged with implementing the 1854 Treaty no longer remembered the Indian understanding of its provisions. As a result, they came to mistakenly believe that the only persons who could receive allotments under Article III of the 1854 Treaty were heads of households alive at the time the treaty was negotiated. Consequently, Congress passed a series of statutes that permitted allotments for tribal members who came of age after the 1854 Treaty was executed, as well as women who would not have otherwise been considered heads of households. These statutes, which were commonly referred to as "Women & Children Acts," required tribal consent to become effective, and specified that allotments should in all other respects be made in accordance with the terms of the 1854 Treaty. None of these statutes authorized state taxation of the allotments.

104.    The first of the statutes, passed in 1901, clarified the allotment process on the Bad River Reservation. It stated as follows:

> *Be it enacted by the Senate and House of Representatives of the United States of American in Congress assembled.* That with the <u>consent</u> of the Chippewa Indians of Lake Superior, located on the Bad River Reservation, in the State of Wisconsin, to be obtained in such manner as the Secretary of the Interior may direct, the President may allot to each Indian now living and residing on said reservation and entitled to so reside, and who has not heretofore received an allotment, not exceeding eighty acres of land, <u>such allotments to be subject in all respects, except as to the age and condition of the allottee, to the provisions of the third article of the treaty</u> with the Chippewas of Lake Superior and the Mississippi, concluded September thirtieth, eighteen hundred and fifty-four.

27

Act of Feb. 11, 1901, ch. 350, 31 Stat. 766 (1901) (the "1901 Bad River Women & Children

Act") (emphasis added), Exhibit D.

105.    The 1901 Bad River Women & Children Act, however, created a new area of

confusion. Federal officials believed that it prohibited them from making allotments to persons

who were eligible under the 1854 Treaty but were not living on the reservation. Congress passed

a new statute in 1907 to correct this misunderstanding:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.* That the Act of Congress approved February eleventh, nineteen hundred and one (Thirty-first Statutes, page seven hundred and sixty-six), entitled "An Act providing for allotments of lands in severalty to the Indians of the La Pointe or Bad River Reservation, in the State of Wisconsin," shall not be construed so as to bar or in any manner abridge or curtail the right of any Indian to allotment on said reservation, whether born before or after the passage of said Act, <u>as provided by the treaty concluded with the Chippewas of Lake Superior</u> and the Mississippi, September thirtieth, eighteen hundred and fifty-four.

Act of Mar. 2, 1907, ch. 2514, 34 Stat. 1217 (emphasis added), Exhibit E. In passing this statute,

Congress noted that the 1901 Bad River Women & Children Act "was designed to enlarge the

right to allotment as defined in the third article of the treaty of September 30, 1854, which prior

to the act of February 11, 1901, was the law controlling allotments on the Bad River or La Pointe

Reservation," while the new statute was designed to correct the construction of the 1901 Bad

River Women & Children Act, which was "unjustly cutting out many [tribal members] who were

formerly entitled [to allotments]." *Allotment of Lands to Indians of La Pointe or Bad River*

*Indian Reservation, Wis.*, H.R. Rep. No. 7287, 59th Cong., 2d Sess.

106.    Following the example set on the Bad River Reservation, Congress enacted a

statute in 1903 that that was virtually identical to the 1901 Bad River Women & Children Act,

but applied to the Lac Courte Oreilles and Lac du Flambeau Reservations. It mandated tribal

consent to become effective, and it required "allotments to be subject in all respects, except as to

the age and condition of the allottee, to the provisions of the third article of the [1854 Treaty]."
Act of Feb. 3, 1903, ch. 399, 32 Stat. 795, Exhibit F. Apparently, some allotments were issued to
women and children on the Lac Courte Oreilles Reservation prior to this statute's enactment, and
out of an abundance of caution, Congress passed another statute in 1924 confirming these
allotments. Act of Apr. 12, 1924, ch. 91, 43 Stat. 92 (validating "restricted fee patents" issued
under the 1854 Treaty, regardless of whether "the allottee was under twenty-one years of age and
not the head of a family when allotted or because the allottee was a female and married but not
the head of a family when allotted"), Exhibit G.

107.    Between 1854 and 1924, the President assigned land within the Tribes'
reservations to individual tribal members under Article III of the 1854 Treaty and the Women &
Children Acts.

108.    Between 1854 and 1924, none of the land assigned to individual tribal members
within the Tribes' reservations was allotted under to the General Allotment Act of 1887.

109.    By 1924, all of the available land on the Tribes' reservations had been allotted,
except on the Lac du Flambeau Reservation. Congress passed a statute requiring a final roll of
eligible Lac du Flambeau tribal members to be created and approved by the Secretary of the
Interior. Congress provided that the Secretary was required to allot the remaining land within the
Lac du Flambeau Reservation to members listed on this final roll "in conformity with the
provisions of the General Allotment Act of February 8, 1887." These allottees were to be
provided "trust patents" with "the usual twenty-five-year restriction clause as to alienation and
taxation." Act of May 19, 1924, ch. 158, 43 Stat. 132 (the "1924 Act"), Exhibit H.

110.    The 1924 Act's provision requiring that allotments be made pursuant to the
General Allotment Act was seemingly adopted by mistake. The bill, as originally introduced,

would have required allotments under to the 1854 Treaty, as all prior statutes had done. But legislators did not review the terms of the 1854 Treaty, and expressed concerns that the allotments be *safeguarded* from taxation and alienation. For example, Representative Carter engaged in the following exchange with bill sponsor, Representative Roach:

> Mr. Carter. . . . It says that allotment shall be made in conformity with the provisions of the treaty of September 30, 1854. Now, can the gentlemen tell me when this land is allotted to the Indians whether they will have the right of alienation or not?
>
> . . . .
>
> When this land is allotted to the Indians there does not seem to be any restrictions as to sale, and so forth, placed in this bill. Now, will the Indians be permitted to alienate? Can the gentleman tell us that?
>
> Mr. Roach. No, I could not; but I do not think they would.
>
> Mr. Carter. That is a very important thing. Unless there is some restriction as to sale, taxation, and incumbrance [sic] placed by the law these people might be left homeless within a very short time.

The allotments made under this 1924 Act were thus subjected to the General Allotment Act because it was mistakenly believed that the 25-year trust period would provide stronger safeguards. After the trust period expired, however, the allottees would have received fee simple title that was explicitly subject to state taxation.

111.    Fortunately, Congress passed the Indian Reorganization Act in 1934, and that statute provided that "[t]he existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress." Indian Reorganization Act, ch. 576, § 2, 48 Stat. 984 (1934).

112.    Upon information and belief, few if any of the parcels allotted under the 1924 Act on the Lac du Flambeau Reservation are currently held in fee simple absolute by the Lac du Flambeau Band or its members.

30

## INAPPLICABILITY OF THE GENERAL ALLOTMENT ACT

113.    In 1889, the U.S. Attorney General's office concluded that the 1887 General Allotment Act was inapplicable to the Lac du Flambeau Reservation because it conflicted with the terms of the 1854 Treaty, which had not been explicitly abrogated. Indian Lands-Allotments-Patent-Act of February 8, 1887, Lac de Flambeau Indians, 9 Land Dec. 392 (Sept. 23, 1889).

114.    In 1894, the Senate Committee on Indian Affairs indicated that the President had "recently declined to grant authority for the allotment of lands under the act of Feb. 8, 1887 [the General Allotment Act]."

115.    The following year, Congress authorized enlargement of the Red Cliff Reservation and confirmed that the land was to be allotted pursuant to the 1854 Treaty, not the General Allotment Act. The only land allotted on the Red Cliff Reservation after 1887 was allotted under this 1895 Joint Resolution.

116.    Congress passed numerous statutes after 1887 that specifically provided that allotment of lands within the Tribes' reservations were to occur under to the 1854 Treaty, not the General Allotment Act of 1887. *E.g.,* 1901 Bad River Women & Children Act, 31 Stat. 766; Act of Feb. 3, 1903, ch. 399, 32 Stat. 795; Act of Mar. 2, 1907, ch. 2514, 34 Stat. 1217; Act of Apr. 12, 1924, ch. 91, 43 Stat. 92. Allotments were issued on the Bad River, Lac du Flambeau, and Lac Courte Oreilles Reservations under to these statutes and the 1854 Treaty.

117.    The General Allotment Act, as amended, provided that allotments of land were held by the United States in trust for a period of time—typically 25 years—before passing into fee simple absolute ownership. General Allotment Act of 1887, ch. 119, § 5, 24 Stat. 388, 389.

118.    None of the land assigned on the Tribes' Reservations between 1854 and 1924 was provided to tribal members in trust.

119.     Between 1854 and 1924, each tribal member who received an assignment of land within the Tribes' Reservations was provided a "restricted fee patent": a patent in fee simple containing a clause that prevented the land from being alienated without the permission of the President.

120.     Between 1854 and 1924, restricted fee patents provided to tribal members for land within the Tribes' Reservations explicitly stated that they were being issued in conformance with the 1854 Treaty.

121.     None of the restricted fee patents provided to tribal members for land within the Tribes' Reservations state that the land is being allotted under the General Allotment Act.

122.     During negotiation of the 1854 Treaty, federal officials promised the Tribes that the treaty would not be altered without their consent. In an 1864 petition to federal officials, the Tribes confirmed this understanding, writing:

> [U.S. Indian Agent Henry] Gilbert again told us, there is no transaction of your Great Father but what will be made public, and there is no one that can invalidate our transactions, even our Great Father cannot destroy the effects of our Contracts.

123.     When Congress believed it was modifying the terms of the 1854 Treaty, it sought the consent of the affected signatory Tribe. *See, e.g.*, Act of June 4, 1888 (noting that the Lac du Flambeau Band had consented by treaty to a railroad right-of-way through the reservation); 1901 Bad River Women & Children Act, 31 Stat. 766 (requiring the consent of the Bad River Band before implementation of the Act's allotment provisions); Act of Feb. 3, 1903, 32 Stat. 795 (requiring the consent of the Lac Courte Oreilles Band and the Lac du Flambeau Band before implementation of the Act's allotment provisions on their respective reservations); Act of May 18, 1916, 39 Stat. 157 (requiring consent of the Lac Courte Oreilles Band and any allottees before granting flowage rights on reservation lands).

124.     When Congress sought to modify the terms of the 1854 Treaty it did so clearly and explicitly, as required by federal law. The only time Congress authorized taxation of allotments within the Tribes' Reservations was in the 1924 Act, when Congress directed the Secretary of the Interior to finish providing allotments on the Lac du Flambeau Reservation "in conformity with the provisions of the General Allotment Act of February 8, 1887." 43 Stat. 132, sec. 1, May 19, 1924.

125.     Other than the 1924 Act discussed in paragraph 109, no subsequent treaty or federal statute has authorized the State to impose taxes on real property owned by the Tribes or their members within their Reservations.

### WISCONSIN'S INCONSISTENT TREATMENT

126.     The Defendants have been inconsistent in their treatment of the tax status of the Reservation Fee Lands.

127.     Historically, Wisconsin has acknowledged that lands within Indian country, including reservation lands, are not subject to state property taxation.

128.     In 1787, the area that is today Wisconsin was among the areas organized as part of the United States, under the Northwest Ordinance of 1787 as enacted by the Continental Congress.

129.     The Northwest Ordinance of 1787 states, in pertinent part:

The utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and in their property, rights and liberty, they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall from time to tine be made, for preventing wrongs being done to them, and for preserving peace and friendship with them.

An Ordinance for the Government of the Territory of the United States, North-west of the River

Ohio ("Northwest Ordinance of 1787"), art. III, Jul. 13, 1787.

130.    Congress established the Territory of Wisconsin on April 20, 1836, and explicitly

forbid the Territory from:

> impair[ing] the rights of person or property now appertaining to any Indians within
> the said territory, so long as such rights shall remain unextinguished by treaty
> between the United States and such Indians, or to impair the obligations of any
> treaty now existing between the United States and such Indians, or to impair or
> anywise to affect the authority of the government of the United States to make any
> regulations respecting such Indians, their lands, property, or other rights, by treaty,
> or law, or otherwise, which it would have been competent to the government to
> make if this act had never been passed[.]

Act Establishing the Territorial Government of Wisconsin, ch. 54, § 1, 5 Stat. 10 (1836).

131.    In 1838, the Territory of Wisconsin established its first system to tax, collect, and

enforce property taxes within its jurisdiction.

132.    Upon information and belief, for decades after the execution of the 1854 Treaty,

the Reservation lands and lands allotted to the Tribes' members were not subject to property

taxation, regardless of the title by which they were held.

133.    In 1983, the Wisconsin Attorney General issued an opinion regarding the taxation

of fee lands within reservation boundaries in Wisconsin. 72 Wis. Op. Att'y Gen. 74 (1983). That

opinion reaffirmed that lands allotted under the 1854 Treaty were not taxable because to be

taxable, "Congress must have manifested 'a clear purpose' to authorize the tax, with doubts and

ambiguities to be resolved in favor of the Indians," yet "the 1854 Treaty contained a clear intent

by Congress to *not* permit state taxation of allotted lands." *Id.* at 77-78 (emphasis added).

134.    The 1983 Attorney General Opinion also concluded, however, that for allotments

issued after 1887, the General Allotment Act applied, and those lands were taxable once held in

fee simple. In doing so, the opinion acknowledged that federal officials had previously

concluded in 1889 – contemporaneously with the General Allotment Act and the allotment of the Tribes' reservations – that the Act did *not* apply to the 1854 Treaty reservations. Despite this, the Attorney General's Opinion came to the opposite conclusion. In doing so, it failed to address the fact that patents issued to tribal members before 1924 (1) stated that they were being made in accordance with the 1854 Treaty and (2) were issued as restricted fee patents (i.e., fee simple patents that could only be alienated with the President's approval) as provided in the 1854 Treaty, rather than as trust patents (i.e., deeds where the United States was still the named title holder), the latter of which was required under the General Allotment Act.

135.    Additionally, the 1983 Attorney General Opinion does not refer to any of the acts that Congress passed *after* the General Allotment Act, which specifically provided for allotments to be issued on the Tribes' Reservations in accordance with the 1854 Treaty, not the General Allotment Act. Thus, it provides no explanation for how these later and more specific acts do not control the earlier, more general act.

136.    The 1983 Attorney General Opinion was not uniformly applied. Some Reservation Fee Lands allotted after 1887 were taxed by local governments including the Defendants, while other Reservation Fee Lands allotted after 1887 were not taxed by the Defendants and other local governments.

137.    The 1854 Treaty also created a reservation for the Keweenaw Bay Indian Community in Michigan's Upper Peninsula. The U.S. District Court for the Western District of Michigan and the U.S. Court of Appeals for the Sixth Circuit have concluded that lands held in fee simple absolute within that reservation by the tribe or its members are not subject to Michigan state property tax. *Keweenaw Bay Indian Cmty. v. Naftaly*, 370 F. Supp. 2d 620 (W.D. Mich. 2005), *aff'd* 452 F.3d 514, 530-33 (6th Cir. 2006).

138.    After *Naftaly* was decided, local governments in Wisconsin continued to inconsistently apply property taxes to the Reservation Fee Lands.

139.    On April 4, 2007, the Department sent letters to local governments and assessors, discussing the *Naftaly* decision. While noting that the decision "d[id] not directly apply to Wisconsin," the letter claimed that its precedent and reasoning were consistent with the 1983 Attorney General Opinion. The letter concluded:

> With regard to land owned by Native Americans that is covered by the 1854 treaty, there is no presumption of taxability in these instances and the burden to prove taxability rests with the municipality. The municipality would be required to determine whether:
>
> (1) the fee parcel is within the outer boundary of the reservation, and
> (2) the parcel was subject to the 1854 treaty.
>
> In this situation the exempt status of reservation land is the result of federal treaties rather than a State statutory exemption. The State does not have authority to tax property that is exempt via federal guidelines unless it is authorized to do so by Congress, so the typical statutorily required documents and exemption requests are not applicable to this type of property.

140.    On July 23, 2007, the Town Board for the Town of Sanborn passed a resolution stating, in part, that the Town's assessor "shall list on its tax roll as 'non-taxable' any land allotted in fee simple pursuant to the 1854 treaty owned by the Tribe or any Tribe member." On information and belief, following this resolution, the Town of Sanborn and its Town Assessors exempted from taxation all parcels of property owned by Bad River tribal members in the Town of Sanborn until January 1, 2015.

141.    On August 24, 2007, the Department sent a memorandum to "Local Assessors of Fee Lands Owned by Native Americans in Reservations in Ashland, Bayfield, Iron, Sawyer, Washburn, Burnett, and Vilas Counties." The memorandum was sent "in response to several inquiries the Department of Revenue received from local assessors," following the Sixth

Circuit's decision in *Naftaly*. The memorandum began by noting that "[w]hen a Native American tribe or tribal member claims a property is exempt under the Treaty of 1854, the property is presumed to be exempt," and the "[t]he onus is on the municipality to challenge this presumption and prove that the property is taxable." The memorandum also noted that the property would be exempt if it was at least 51% owned by the tribe or tribal members. If the tribe or tribal members owned less than a 50% interest in the land, then the land would be taxable, in part. Finally, the memorandum reiterated the faulty logic regarding allotments made after 1887, noting that "[t]he Congressional Act which provides that most fee simple Native American land is taxable is the General Allotment Act of 1887," and that "[l]and allotted pursuant to that Act . . . is taxable," "[h]owever, some land allotted before 1887, such as that allotted to Ojibwe tribal members under the 1854 treaty, may be exempt."

142.    In May 2008, the Department issued additional guidance, this time adding a new argument for the taxability of the Reservation Fee Lands. The Department claimed that if lands allotted under the 1854 Treaty had been sold to a nonmember—anywhere in the chain of title—and reacquired by the Tribe or a Tribal member

> [s]uch land would likely be taxable. The U.S. Supreme Court has held that, where lands located within a reservation became taxable by virtue of their sale to non-Indians, the subsequent repurchase of those lands by the tribe or tribal members did not restore the lands to non-taxable status. If courts follow a similar line of reasoning in this situation, the "repurchased lands" are likely to be taxable. Local taxing authorities should consult with their attorneys when attempting to determine the status of a parcel of this nature.

143.    The May 2008 Department letter did not acknowledge that only Congress could authorize state taxation of Indian-owned property within Indian country. It also failed to discuss how the 1854 Treaty was understood by the Tribes. Importantly, the May 2008 Department letter failed to acknowledge that the Tribes understood the 1854 Treaty to allow them the ability to

grant nonmembers permission to live on the Reservations, while assuring them that their permission could be revoked at any time. Tribal negotiators were not told that granting nonmembers permission to remain on the Reservations would result in any diminution of tribal rights.

144.     It is the duty of the Department to prepare and publish manuals that provide direction to assessors deciding the taxation and valuation of property under Chapter 70 of the Wisconsin Statutes. Wis. Stat. § 73.06.

145.     The Department issued Publication 405, entitled "Wisconsin Taxation Related to Native Americans," which was most recently updated in December 2017. That publication states:

> Real property owned by tribes, Native Americans, or Native American businesses in fee simple and located on the reservation is subject to state and local taxation, unless prohibited by federal preemption.

146.     This statement of the law is contrary to U.S. Supreme Court precedent, which categorically precludes state taxation of Indian-owned lands unless Congress has "made its intention to [authorize state taxation] unmistakably clear." *Blackfeet Tribe*, 471 U.S. at 765. The preemption test referenced in Publication 405, is used when determining whether a state can tax *non-Indian* activity within reservation boundaries. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980) (precluding state taxation of non-Indian contractor operating on reservation after conducting "a particularized inquiry into the nature of the state, federal, and tribal interests at stake . . . to determine whether . . . the exercise of state authority would violate federal law," while noting that if only Indian activity had been involved this test would not apply because "state law is generally inapplicable").

147.     Publication 405 also includes a specific discussion of the 1854 Treaty and the taxability of the Reservation Fee Lands. That portion states:

The Treaty of 1854 exempts real property located within the reservation boundaries of the Bad River, Lac Courte Oreilles, Lac du Flambeau, and Red Cliff Chippewa bands if the real property was:

- Allotted before February 8, 1887;
- Owned in fee simple by the tribe or a member of that tribe; and,
- Not conveyed to nontribal members since it was first allotted under the 1854 Treaty:
- Real property is subject to property taxation under the provisions of the 1854 Treaty if it was sold to a nontribal member at any time since allotment
- Real property would remain subject to property tax if later repurchased by the tribe or a member of that tribe.

Thus, this publication conforms to the erroneous 1983 Attorney General Opinion by concluding that land allotted after the passage of the General Allotment Act is automatically taxable. It also restates the position asserted by the Department for the first time in its May 2008 guidance letter, claiming that once an allotment is alienated to a non-member, it becomes taxable and remains as such, even if it is later repurchased by the tribe or a tribal member.

148.    Following the Sixth Circuit's 2006 decision in *Naftaly* and the Department's conflicting guidance in 2008, local governments—including the Defendants—adopted inconsistent positions regarding the taxability of the Reservation Fee Lands.

149.    In March/April 2008, Defendant Town of Bass Lake entered into a Tax Agreement with the Lac Courte Oreilles Band. The 2008 Tax Agreement acknowledged the Sixth Circuit's decision in *Naftaly* and noted that "[n]o meaningful distinction has been made between the facts involved in the *Keweenaw Bay* decisions and the situation of the [Lac Courte Oreilles] Tribe and its duly enrolled members." As a result, the 2008 Tax Agreement stated that "it is proper to conclude that fee land located within the limits of the 1854 Reservation which is owned by the Tribe or Tribal Members is exempt from all real property taxes and related fees, penalties, interest, levies, forfeitures and proceedings." The Town of Bass Lake acknowledged that land was tax-exempt regardless of whom it was acquired from, stating: "if the Tribe or

39

Tribal member(s) purchase fee land located within the limits of the 1854 Reservation from any person or entity, at any time, such fee land shall immediately be exempt [from taxation]."

150.    The 2008 Tax Agreement described in paragraph 149 remained in effect for several years before it was unilaterally terminated by the Town of Bass Lake, which then began taxing the Reservation Fee Lands.

151.    Defendant Town of Hayward also entered into a Memorandum of Understanding with the Lac Courte Oreilles Band in 2008 that acknowledged that the Reservation Fee Lands were not subject to state taxation. Like the 2008 Tax Agreement, this Memorandum of Understanding remained in effect for several years before it was unilaterally terminated by the Town of Hayward, which then began taxing the Reservation Fee Lands.

152.    The Towns of Couderay, Hunter, and Sand Lake also entered into agreements with the Lac Courte Oreilles Band in 2008 that acknowledge that the Reservation Fee Lands are not subject to state taxation. These agreements remain in effect, and the Reservation Fee Lands in these towns have not been subjected to state taxation.

153.    Over the past three years, the Department has directed local governments to assess, collect, and enforce real property taxes against the Reservation Fee Lands.

154.    In response to the Department's direction, various towns, including the named Defendants, have asserted authority to tax the Reservation Fee Lands.

155.    In March 2017, the Town of Sanborn Board of Review delivered a Notice of Assessments to Bad River and its members, indicating that it would begin taxing fee land starting on January 1, 2015.

156.    In July 2017, Jennie Martin, Assessor for the Town of Russell, Bayfield County, Wisconsin, sent a letter to multiple Red Cliff tribal members owning fee simple property within

the Reservation boundaries. That letter claimed that the Reservation Fee Lands were only exempt from state taxation if allotted before 1887 and if they never left tribal-member-ownership. Property that did not meet these criteria was allegedly taxable.

157.    The Tribes and their members have objected to state taxes levied on the Reservation Fee Lands.

158.    In some cases, the Tribes and their members have paid assessed taxes under protest, noting that the Reservation Fee Lands are not subject to state taxation because of the 1854 Treaty.

159.    Certain Defendants have begun assessing the Reservation Fee Lands under the presumption that such lands are subject to state taxation and erroneously placing the burden of proof on the Tribes or their members to demonstrate otherwise.

160.    The Tribes do not have an adequate remedy at law to redress the continued wrongful imposition of real property taxes on the Reservation Fee Lands.

## COUNT I

### (Declaratory Judgment, 28 U.S.C. § 2201)

161.    The Tribes reallege and incorporate by reference paragraphs 1 - 160.

162.    The Defendants' actions to assess, collect, and enforce Wisconsin property taxes upon the Reservation Fee Lands violates the Supremacy Clause, Article VI of the U.S. Constitution, because these actions violate provisions of the 1854 Treaty.

163.    The 1854 Treaty set apart the Reservations as permanent homes for the Tribes and their members. The Tribes were promised that they would never be involuntarily removed from these lands. As such the imposition and enforcement of state property taxes, which could result

in the removal of the Tribes and/or their members from the Reservations, is precluded by the 1854 Treaty.

164.    Congress has not passed any statute that clearly and expressly abrogates the right described in paragraph 163, and the Tribes have not been afforded just compensation for such an abrogation. Thus, the right remains in full force and effect.

165.    The Tribes are entitled to a declaration under 28 U.S.C. § 2201 that the Reservation Fee Lands are not subject to Wisconsin property taxes.

166.    The Tribes are also entitled to a declaration under 28 U.S.C. § 2201 that any action by the Defendants to assess, collect, or enforce Wisconsin property taxes upon the Reservation Fee Lands would constitute an act in excess of the Defendants' authority and any authority that the State of Wisconsin could confer.

## COUNT II

### (Declaratory Judgment, 28 U.S.C. § 2201)

167.    The Tribes reallege and incorporate by reference paragraphs 1 - 160.

168.    The Defendants' actions to assess, collect, and enforce Wisconsin property taxes upon the Reservation Fee Lands violates the Supremacy Clause, Article VI of the U.S. Constitution, because states are precluded as a matter of federal law from taxing Indian-owned lands within Indian country, as defined in 18 U.S.C. § 1151, absent an unmistakably clear authorization by Congress.

169.    The 1854 Treaty did not authorize state taxation of the Reservation Fee Lands.

170.    The General Allotment Act of 1887, as amended, was not applied to the Tribes' Reservations. Rather, allotment of the Tribes' Reservations was conducted under the terms of the

1854 Treaty and later reservation-specific statutes. Thus, the General Allotment Act does not constitute Congressional authorization for state taxation.

171.    The Defendants have not identified any federal statute other than the General Allotment Act, as amended, that authorizes state taxation of the Reservation Fee Lands.

172.    The Tribes are entitled to a declaration under 28 U.S.C. § 2201 that the Reservation Fee Lands are not subject to Wisconsin property taxes.

173.    The Tribes are also entitled to a declaration under 28 U.S.C. § 2201 that any action by the Defendants to assess, collect, or enforce Wisconsin property taxes upon the Reservation Fee Lands would constitute an act in excess of the Defendants' authority and any authority that the State of Wisconsin could confer.

## COUNT III

### (Declaratory Judgment, 28 U.S.C. § 2201)

174.    The Tribes reallege and incorporate by reference paragraphs 1 - 160.

175.    The Defendants' actions to assess, collect, and enforce Wisconsin property taxes upon the Reservation Fee Lands owned by the Tribes violates the Supremacy Clause, Article VI of the U.S. Constitution, and the Indian Commerce Clause of Article I, section 8, clause 3 of the U.S. Constitution, because the Nonintercourse Act, 25 U.S.C. § 177, prohibits state taxation of lands owned by an Indian tribe.

176.    The Tribes are entitled to a declaration under 28 U.S.C. § 2201 that the Reservation Fee Lands owned by the Tribes are not subject to Wisconsin property taxes.

177.    The Tribes are also entitled to a declaration under 28 U.S.C. § 2201 that any action by the Defendants to assess, collect, or enforce Wisconsin property taxes upon the

Reservation Fee Lands would constitute an act in excess of the Defendants' authority and any authority that the State of Wisconsin could confer.

## COUNT IV

### (Permanent Injunction)

178.     The Tribes reallege and incorporate by reference paragraphs 1 - 160.

179.     The Defendants' actions to assess, collect, and enforce Wisconsin property taxes upon the Reservation Fee Lands are invalid because, among other reasons, those actions violate the Supremacy Clause and the Indian Commerce Clause of the U.S. Constitution, the 1854 Treaty, the Nonintercourse Act, 25 U.S.C. § 177, and fundamental principles of federal common law.

180.     Unless the Defendants' actions to assess, collect, and enforce Wisconsin taxes upon Reservation Fee Lands are enjoined, the Tribes and their members will be irreparably harmed.

181.     The Tribes are entitled to relief under Fed. R. Civ. P. 65, enjoining the Defendants from assessing, collecting, or enforcing Wisconsin taxes upon Reservation Fee Lands.

## PRAYER FOR RELIEF

**WHEREFORE**, the Tribes respectfully asks this Court to enter judgment in their favor and to:

I.     Issue a declaration that the Defendants, their assigns, employees, or agents do not possess the requisite jurisdiction to impose state property taxes on the Reservation Fee Lands.

II.     Issue a permanent injunction prohibiting the Defendants, their assigns, employees, or agents from assessing state property taxes on the Reservation Fee Lands.

III.      Provide reimbursement for the Tribes' fees and costs, to the full extent permitted

by law.

IV.      Grant such further relief as this Court may deem just and proper.

Respectfully submitted on this 30th day of November 2018.

s/Colette Routel

Colette Routel
Director, Indian Law Litigation Clinic
Mitchell Hamline School of Law
875 Summit Avenue
St. Paul, MN 55105
Ph: (651) 290-6327
Email: colette.routel@mitchellhamline.edu

*Counsel for all Plaintiffs*

Vanya S. Hogen
Andrew Adams III
Peter J. Rademacher
Leah K. Jurss
Hogen Adams PLLC
1935 W. County Road B2, Suite 460
St. Paul, Minnesota 55113
Ph: (651) 842-9100
Fax: (651) 842-9101
Email: vhogen@hogenadams.com
      aadams@hogenadams.com
      prademacher@hogenadams.com
      ljurss@hogenadams.com

*Counsel for all Plaintiffs*

Kekek Jason Stark
Dyllan Linehan
Lac Courte Oreilles Band of Lake Superior
Chippewa Indians of Wisconsin
13394 W. Trepania Road
Hayward, WI 54843
Phone: (715) 634-8934
Email: Kekek.Jason.Stark@lco-nsn.gov
      Dyllan.Linehan@lco-nsn.gov

*Counsel for Lac Courte Oreilles Band of Lake
Superior Chippewa Indians of Wisconsin*

David Ujke
Red Cliff Band of Lake Superior Chippewa
Indians of Wisconsin
88385 Pike Road
Bayfield, WI 54814
Phone: (715) 779-3725 ext. 30
Email: dujke@redcliff-nsn.gov

*Counsel for Red Cliff Band of Lake Superior
Chippewa Indians of Wisconsin*

45

Erick Arnold
Bad River Band of Lake Superior Tribe of
Chippewa Indians of the Bad River
Reservation, Wisconsin
72662 Maple St.
Ashland, WI 54806
Po Box 39
Odanah, WI 54861
Phone: (715) 682-7101
Email: attorney@badriver-nsn.gov

*Counsel for Bad River Band of Lake Superior
Tribe of Chippewa Indians of the Bad River
Reservation, Wisconsin*