IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LAC COURTE OREILLES BAND OF LAKE
SUPERIOR CHIPPEWA INDIANS OF WISCONSIN,
LAC DU FLAMBEAU BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS OF THE LAC DU FLAMBEAU
RESERVATION OF WISCONSIN,
RED CLIFF BAND OF LAKE SUPERIOR CHIPPEWA
INDIANS OF WISCONSIN, and
BAD RIVER BAND OF LAKE SUPERIOR TRIBE OF
CHIPPEWA INDIANS OF THE BAD RIVER
RESERVATION, WISCONSIN,

                         Plaintiffs,

        v.

TONY EVERS, PETER BARCA,
TOWN OF BASS LAKE, TOWN OF HAYWARD,
TOWN OF LAC DU FLAMBEAU,
TOWN OF SANBORN, TOWN OF RUSSELL,
TOWN OF ASHLAND, TOWN OF WHITE RIVER,
TOWN OF GINGLES, TOWN OF BOULDER
JUNCTION, TOWN OF MERCER, TOWN OF
SHERMAN, SCOTT ZILLMER, WILLIAM
MIETZINGER, MICHAEL SCHNAUTZ, CLAUDE
RIGLEMON, ASSOCIATED APPRAISAL
CONSULTANTS, INC., PAUL CARLSON, and
JENNIE MARTEN,

                         Defendants.

OPINION and ORDER

18-cv-992-jdp

---

        The plaintiffs are four Ojibwe tribes with reservations in northern Wisconsin. Those

reservations were established by the 1854 Treaty of La Pointe, which included a provision,

common in treaties of the era, by which the President of the United States could allot parcels

of reservation land to private ownership by individual Indians. Whether Wisconsin and its

municipalities may tax those allotted parcels is the central issue in this case.

The parties agree that reservation property allotted before 1887 is not taxable. The State of Wisconsin contends that any property allotted after 1887 is taxable by virtue of the federal General Allotment Act, enacted that year. And all agree that reservation property allotted under the General Allotment Act is taxable, as the Supreme Court held in *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251 (1992). But the tribes contend that the General Allotment Act does not apply to property on their reservations. Instead, the tribes say that even after 1887 reservation land was allotted pursuant to the 1854 treaty, under which Indian-owned land on the plaintiffs' four reservations is not taxable. The material facts are undisputed, and the case turns primarily on the interpretation and legal effect of the General Allotment Act.

Congress has the authority to repudiate an Indian treaty, and it has the authority to tax Indian-owned reservation property. But to do either, it must express its intent in unmistakably clear terms. The historical record shows that land in the tribes' reservations was allotted pursuant to the 1854 treaty, and the General Allotment Act does not express Congress's intent to usurp rights granted to the tribes under the 1854 treaty, and certainly not in unmistakably clear terms. The court concludes that, generally, Indian-owned property on the plaintiff tribes' reservation is not taxable, following the reasoning of *Keweenaw Bay Indian Community v. Naftaly*, 452 F.3d 514 (6th Cir. 2006), which also addresses taxation of property allotted under the 1854 Treaty of La Pointe. But any property that has been transferred to non-Indian ownership is now taxable, even if it has subsequently returned to Indian ownership. That result is required under *Cass County, Minnesota v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103 (1998), which held that Indian tax immunity does not lie dormant during periods of non-Indian ownership only to be revived when the property returns to Indian ownership.

2

The four plaintiff tribes seek declaratory and injunctive relief from officers of the State of Wisconsin: Wisconsin Governor Tony Evers and Wisconsin Department of Revenue Secretary Peter Barca. The tribes also seek relief from several Wisconsin townships, and their assessors, who are imposing the disputed taxes.[1] This is a civil matter, brought by federally recognized Indian tribes, arising under the laws and treaties of the United States. Accordingly, the court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1362.

Many motions are before the court, but the main ones are the cross-motions for summary judgment filed by the state, Dkt. 149, and the tribes, Dkt. 156. This opinion begins with brief background, addresses the preliminary motions, and then turns to the main motions for summary judgment.

BACKGROUND

The tribes have submitted a substantial set of background facts pertaining to the history of the tribes, the negotiation of the 1854 treaty, and the state's taxation of Indian land. The state disputes none of these facts. Dkt. 224. It's an important part of Wisconsin history, but few of the facts are material to the issues before the court, so a succinct summary suffices.

As part of a broader campaign to facilitate settlement and westward expansion, the United States negotiated with the Ojibwe (also referred to as the Chippewa) to secure rights to territory near the Great Lakes historically occupied by the Ojibwe, particularly including mining rights in those areas. The negotiations produced a series of treaties, culminating in the

---

[1] Individual tribe members have filed 41 lawsuits against the Town of Sanborn regarding its past taxation of reservation fee lands, Case Nos. 18-cv-612–623 and 18-cv-625–53 (W.D. Wis.). Those cases have been stayed pending resolution of this case. Once this case, including any appeal, is resolved, the court will lift the stays in those cases.

1854 Treaty of LaPointe. Dkt. 1-3. Under the 1854 treaty, groups of Ojibwe, predecessors of the current plaintiff tribes, ceded more than seven million acres in northeastern Minnesota in exchange for permanent reservations and other compensation. The critical concern for the Ojibwe in the treaty negotiations was to secure permanent homes on reservation land to preclude any future removal. Article 11 of the treaty provided that "the Indians shall not be required to remove from the homes hereby set apart for them."

Article 3 of the treaty addressed allotment, the process by which tribe-owned reservation land could be transferred to ownership by an individual Indian. Under the 1854 treaty, the President of the United States could, at his discretion, allot eighty-acre tracts to individual tribal members with whatever restrictions on alienation that the President determined to impose. The treaty did not expressly address taxation.

As a general matter, allotment was part of the United States' assimilationist policy toward the Indians, by which the federal government intended to encourage Indians to become farmers on their own privately owned land, thereby diminishing the influence and authority of the tribes. Although allotment had been provided for in treaties negotiated with tribes, a generally applicable allotment process was established as a matter of federal statutory law in 1887 with the General Allotment Act, also referred to as the Dawes Act. The General Allotment Act provided, in pertinent part:

> [I]n all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to . . . allot the lands in said reservation in severalty to any Indian located thereon . . . .

4

General Allotment Act, ch. 119, 24 Stat. 388 (1887). Real property on the Ojibwe reservations was allotted to private ownership both before and after enactment of the General Allotment Act on February 8, 1887, a decisive date in the state's tax policy.

The Wisconsin Department of Revenue provides guidance to Wisconsin municipalities concerning taxation, although the municipalities actually impose and collect the property tax. The Department's most recent guidance on the taxation of reservation property is a May 2008 letter to officials in the several northern Wisconsin counties where the plaintiff tribes' reservations are. Dkt. 168-40. The basic advice is that Indian-owned land allotted before 1887 is not taxable; land allotted after that date is. As the advice letter puts it:

> State and local governments may not impose property tax on reservation lands that are owned in fee simple by Native American tribes or tribal members and that were allotted by the 1854 Treaty of La Pointe before February 8, 1887. The lands allotted by the 1854 Treaty include acreage that is within the reservation boundaries of the Lac du Flambeau, Bad River, Lac Courte Oreilles, and Red Cliff. Other tribes did not participate in the 1854 Treaty.
>
> . . .
>
> It is important to note that the 1854 Treaty is tribal and land specific. . . .
>
> . . .
>
> The Attorney General has stated that state and local governments may impose property tax on fee simple reservation land owned by a tribal member or tribe IF the land was allotted pursuant to the General Allotment Act of 1887 after February 8, 1887. Land that was allotted by the Treaty of 1854 before February 8, 1887, is tax exempt.

Dkt. 168-40. The Department was equivocal about land that was allotted under the treaty, sold to a non-tribal member, then purchased by a tribe or tribal member. The letter advises

that such property "would likely be taxable" and recommends that local authorities consult with their attorneys to determine the tax status of property repurchased by Indians. *Id.*, at ¶ 9.

The municipal defendants have followed this guidance and taxed Indian-owned reservation land; the tribes have paid the tax under protest.

PRELIMINARY MOTIONS

**A.  Motions to dismiss by the municipal defendants**

The municipal defendants have filed motions to dismiss the tribes' claims against them under Federal Rule of Civil Procedure 12(b)(6). Dkt. 116; Dkt. 125; Dkt. 128; Dkt. 132; Dkt. 133; Dkt. 145. Several municipal defendants press the same arguments in a motion for summary judgment. Dkt. 192.

Some of the motions to dismiss may be untimely (because some defendants had already answered the complaint without asserting failure to state a claim), but the court can treat an untimely motion to dismiss as a motion for judgment on the pleadings under Rule 12(c). *See Saunders-El v. Rohde*, 778 F.3d 556, 559 (7th Cir. 2015).

Taken together, the motions by municipal defendants raise three arguments why the tribes' claims against them should be dismissed. First, their main argument is that dismissal is required because the municipalities simply follow state guidance in assessing taxes and because any judgment on the state defendants would bind them. But local officials responsible for implementing challenged laws are often named as defendants in lawsuits. *See, e.g., Nordlinger v. Hahn*, 505 U.S. 1 (1992) (county tax assessor named as defendant in suit challenging state formula for assessing property values for property tax purposes); *see also* 74 Am. Jur. 2d Taxpayers' Actions § 67 ("[P]ublic officers whose acts are sought to be enjoined or corrected

6

are proper and usually necessary and indispensable parties defendant."). So even if the municipal defendants are not necessary parties, they may be permissively joined under Rule 20.

Second, the municipal defendants argue that they are not properly joined as permissive defendants under Rule 20 because the tribes' claims against them are based on individual tax decisions, and the factual disparities among these decisions do not support permissive joinder. But the tribes haven't alleged vastly disparate violations of the same law; they allege consistent conduct among the municipal defendants, through a series of similar and related transactions directed at individual taxpayers. Common questions of law apply to all defendants in this case, and the municipal defendants are properly joined as permissive defendants under Rule 20.

Third, the municipal defendants object that the tribes did not name as defendants all the towns and assessors who would be subject to the court's ruling. The tribes have entered agreements with some municipalities that Indian-owned reservation land will not be taxed, and those municipalities have not been named as defendants. The municipal defendants do not explain why Rule 19, which governs joinder of required parties, would require the tribes to sue towns and assessors who are not engaging in the challenged conduct.

The court will deny the municipal defendants' motions to dismiss and the motion for summary judgment asserting the same arguments.

**B.  Plaintiff tribes' motion to dismiss the Town of Mercer**

The tribes have filed a motion under Federal Rule of Civil Procedure 41(a) to dismiss defendants Town of Mercer and its assessor Paul Carlson because no reservation property lies within the Town of Mercer. Dkt. 128. The tribes seek dismissal without prejudice. The Town of Mercer and Carlson agree that dismissal is appropriate, but they ask that it be with prejudice.

Rule 41(a) can be used only to dismiss the entire action; the appropriate vehicle to remove individual claims or parties is an amended pleading under Rule 15(a). *See Taylor v. Brown*, 787 F. 3d 851, 857–58 (7th Cir. 2015). So the court will construe the tribes' motion as one to amend their complaint by striking the claims against the Town of Mercer and Carlson, and the court will grant the motion. The court will dismiss these claims without prejudice because the parties agree that the Town of Mercer has no reservation property to tax. Thus, the court lacks jurisdiction because there is no "live case or controversy" with the Town of Mercer for the court to decide. *Burke v. Barnes*, 479 U.S. 361, 363 (1987). When a federal court lacks subject-matter jurisdiction over a claim, it must dismiss that claim without prejudice. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019).

## C. Plaintiff tribes' evidentiary motions

The core historical facts, and the material facts of the state's tax policies and practices, are undisputed. The state didn't dispute any of the facts proposed by the plaintiff tribes. Dkt. 224. But the tribes object to parts of the state's description of the history of the 1854 treaty and federal Indian policy, and they make several motions asking the court to disregard some of the state's evidence.

The tribes move in limine to exclude the expert testimony of Dr. Jay L. Brigham, the state's historical expert. Dkt. 114. Brigham is a Ph.D. historian who now works primarily as an expert witness. Brigham does not have any special expertise in American Indian history, and he has not studied the 1854 treaty or its historical context. The state says that it offers Brigham for the limited purpose of assembling and presenting some historical data about land ownership on the reservations of the plaintiff tribes, and it says that "Dr. Brigham has not offered an

8

opinion on the ultimate issue of the taxability of unrestricted Indian-owned fee lands which, in any event, is a question of law on which expert testimony is unnecessary." Dkt. 155, at 10. The assembly of the land ownership information is within Brigham's expertise, so the court will admit section IV of Brigham's report. Dkt. 82, at 5–10. The data show that land on the tribes' reservations was allocated both before and after 1887. The court will grant the tribes' motion with respect to the rest of Brigham's report.

The tribes move in limine to exclude two of the opinions offered by Dr. Anthony Gulig, the state's rebuttal expert on the history of the 1854 treaty. Dkt. 217. The challenged opinions concern what the Ojibwe understood about certain topics related to property ownership and taxation during the negotiation of the treaty. The court must consider the historical context of the treaty. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999). But the court is generally skeptical of experts offering opinions on essentially legal issues—in this case, the meaning of the treaty and the legal effect of the General Allotment Act—so it approaches both sides' historical experts with caution. The tribes' brief in support of their motion to limit Gulig's opinions reads more like a further rebuttal report or a closing argument than a proper *Daubert* motion. The tribes offer some good reasons why a trier of fact might reject Gulig's opinions, but the court is not persuaded that his opinions are inadmissible.

That said, the court is particularly skeptical of attempts to ascribe specific knowledge or intent to the Indians who negotiated the 1854 treaty. We have a great deal of evidence about the United States' objectives because its policies were expressed and recorded, but evidence from the Indian side is relatively sparse. The court's purpose in interpreting an Indian treaty is to derive the parties' intent, not to redress past injustices. Nevertheless, Indian treaties must be construed liberally in favor of the Indians. *Oneida Cty., N.Y. v. Oneida Indian Nation of*

*N.Y. State*, 470 U.S. 226, 247 (1985). Accordingly the court will not rely on Gulig's opinion that the Ojibwe understood that property tax was a necessary implication of the treaty's allotment provision. In any case, the state repeatedly disavows reliance on any disputed historical facts, acknowledging that the case turns primarily on legal issues. The tribes' motion to exclude Gulig's opinion is denied, although the challenged opinions are immaterial to the court's decision on the merits.

The tribes move to strike the portions of the state's summary judgment materials that rely on federal statutes that were not disclosed in response to the tribes' contention discovery. Dkt. 205; Dkt. 226. Contention interrogatories are an appropriate means of getting an opponent's commitment to its litigation positions to prevent sandbagging. A proper response to a contention interrogatory must fairly set out the party's basic positions on the issues; but it does not require exhaustive disclosure of every authority that the party might bring to bear in support of those positions. At summary judgment, both sides cited a vast tapestry of federal legislation and secondary sources in support of their interpretations of the 1854 treaty and the General Allotment Act. The state did not invoke any undisclosed federal statute as a separate new source of its taxation authority. The court sees no sandbagging by the state; the motions are denied.

ANALYSIS

Both the tribes and the state move for summary judgment on the question of whether Indian-owned property on the tribes' reservations is taxable. Summary judgment is appropriate if the moving party shows that the material facts are not in genuine dispute and the party is entitled to judgment as a matter of law. The usual standards apply to cross motions for

10

summary judgment: the court construes the facts and inferences arising from them in the light most favorable to the non-moving party. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). The parties sharply dispute the conclusions that the court should draw from the long history they present, but the main issue in this case concerns the legal effect of the General Allotment Act, which is a matter of law appropriately resolved on summary judgment.

The tribes also move for summary judgment on the affirmative defenses pleaded by the municipal defendants. Neither the state nor the municipal defendants themselves have responded to this part of the tribes' motion, so that part will be granted as unopposed.

## A.  General rule for Indian-owned property allotted after 1887

States and municipalities have no power to tax reservation lands unless the tribe has ceded jurisdiction over the land or unless Congress has authorized taxation with "unmistakably clear" intent. *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 258 (1992) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765 (1985)). The tribes have not ceded jurisdiction, so Indian-owned land on the tribes' reservations can be taxed only under unmistakably clear direction from Congress.

The parties agree on two basic points. First, reservation land allotted under the 1854 treaty before the 1887 enactment of the General Allotment Act is not taxable. Second, reservation land allotted under the authority of the General Allotment Act is taxable, as the Supreme Court held in *Yakima*. The core dispute is whether land allotted *after* enactment of the General Allotment Act is necessarily allotted under the authority of the General Allotment Act and is thus taxable, as the state Department of Revenue has instructed its municipalities for years.

1.  **Tax immunity of the tribes' land before 1887**

The state concedes that land allotted under the 1854 treaty before 1887 is not taxable, consistent with its longstanding guidance to municipalities. But *why* that property is not taxable provides context for the court's analysis of the General Allotment Act, and the parties diverge on that point.

The state does not expressly say why land allotted before 1887 is not taxable. But the court infers that the state's view is that the 1854 treaty is entirely silent on taxation, and there was no congressional expression of intent to tax land on the plaintiff tribes' reservations until the 1887 General Allotment Act. So, for the state, that tax immunity is the result of thirty-three years of congressional silence.

The tribes, by contrast, contend that tax immunity was an implicit but important term of the treaty itself. Recall that the critical concern for the Ojibwe during the treaty negotiation was the establishment of reservations as permanent homes, from which they could not be removed. That concern was reflected in Article 11, which provided that "the Indians shall not be required to remove from the homes hereby set apart for them."

The state makes two counter-arguments, one historical, the other textual. The textual argument is that that Article 11 applies only to the reservations, not to property allocated to individual ownership, because of the use of the word "hereby." Dkt. 202, at 15. The treaty, the argument goes, only established the reservations; the allotments would come later. So the promise of non-removal only applies to what was established "hereby," which is to say by the treaty itself. But equating the term "homes" with the term "reservation" would be a peculiar reading of the term "homes." The term "homes" is used only once in the treaty, and nothing in the treaty suggests that it would be a synonym for "reservations." The treaty also established

12

entitlements to some individually owned tracts, Article 2, ¶ 6, and the allotment process itself was established by the treaty, so it's not a stretch to consider the to-be-allotted tracts as having been established by the treaty. The reservations themselves were not entirely established by the treaty; the boundaries of some of those were to be set later. Article 2, ¶¶ 3, 4. The court is not persuaded that "hereby" in Article 11 has the limiting effect that the state proposes.

The state's historical argument is based on Gulig's opinion that allotment was important to the tribes because private ownership would protect against non-Indian encroachment and prevent governmental removal. Dkt. 153, at 8. The court has already explained why it will not credit Gulig's specific opinion that, during the negotiation of the treaty, the tribal negotiators understood that private ownership would necessarily entail taxation. The state does not rely on that specific opinion in its briefs, and it makes no attempt to show that taxation of the allotted parcels was authorized by the treaty itself.

The broader context of the treaty supports the tribes' interpretation. Taxation of reservation land implies the government's ability to enforce the tax obligation, by liens, foreclosure, and eviction if necessary. As Chief Justice Marshall observed long ago, "[T]he power to tax involves the power to destroy," *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819), which is one of the principles on which the Supreme Court has based its decisions on the taxability of Indian property. *See Yakima*, 502 U.S. at 257–58. Taxation of Ojibwe reservation land is inconsistent with the permanency promised in the 1854 treaty. This may not be expressly stated, but it is the most reasonable interpretation of the treaty, given the undisputed historical context and the "deeply rooted" principle that United States courts must read treaties and statutes liberally in favor of the Indians. *Oneida County*, 470 U.S. at 247. The Court of Appeals for the Sixth Circuit has endorsed this interpretation, holding that the grant of

permanent homes in the 1854 Treaty of La Pointe bars state taxation of Indian-owned land in the plaintiff tribes' reservations. *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514, 527 (6th Cir. 2006).

The court concludes that before 1887, the tax immunity of the tribes' reservation land was not merely a matter of congressional silence, but a negotiated part of the 1854 treaty. And, as a negotiated part of the treaty, congressional intent to rescind treaty-granted tax immunity would have to be expressed with particularly pointed clarity.

## 2. The effect of the General Allotment Act on the tax status of the tribes' reservations

The state's main contention can be simply stated: the General Allotment Act applies throughout the United States to any allotment of reservation land occurring after its enactment on February 8, 1887 (subject only to a few explicit exceptions that are not applicable to the plaintiff tribes). It's not clear from the record how much of the plaintiff tribes' reservation property was allotted to individual ownership before 1887, but a substantial amount was allotted after, as Brigham's data and the individual land patents provided by the tribes show.

The text of the General Allotment Act does not provide much support for the state's position. The General Allotment Act is certainly "general" in the sense that it applies to any Indian reservation in the United States, whether created by treaty, act of Congress, or executive order, with only a few specified exceptions. The General Allotment Act gave the President of the United States the authority, without the consent of the tribes, to allot any part of a reservation to individual ownership that in his opinion was "advantageous for agricultural and grazing purposes." The General Allotment Act spelled out many details of the allotment process, including the manner of selecting the allotted parcels and the quantity to be allotted

14

to individual Indians, depending on family status. It provided that allotted land would be held in trust for 25 years, after which it would be conveyed to the recipient or his heirs "in fee, discharged of said trust and free of all charge or incumbrance whatsoever." And, after amendment by the 1906 Burke Act, the General Allotment Act provided that allocated parcels would be subject to taxation once the restrictions on alienation of the allotted parcel were lifted.

But the General Allotment Act does not state that it withdraws any rights granted by treaty. Congress has nearly complete authority in the area of tribal relations, including the authority to repudiate its own promises and ratified treaties. *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020); *Herrera v. Wyoming*, 139 S. Ct. 1686, 1696 (2019). But it cannot do so by implication. "There must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 203 (1999) (citing *United States v. Dion*, 476 U.S. 734, 740 (1986)). The General Allotment Act does not show that Congress recognized any conflict with the treaty, nor does it express any clear intent to roll back treaty rights.

To the contrary, action by the federal government after 1887 shows that land on the plaintiff tribes' reservations continued to be allotted under the 1854 treaty, not under the General Allotment Act.

Shortly after the General Allotment Act's passage in 1887, President Grover Cleveland granted initial approval for the allotment of land on one of the plaintiff tribes, the Red Cliff Band, under the General Allotment Act. But by 1889, the federal government concluded that allotment of the tribes' land should take place under the 1854 treaty, not the General

15

Allotment Act, and it continued to allot the tribes' land under the treaty. When Cleveland was asked in 1894 to allot Red Cliff Band reservation land under the General Allotment Act, he refused to do so, stating that he believed that the land could not be allotted under the General Allotment Act. Dkt. 224, ¶¶ 200–11.

Congress also recognized that allotment under that 1854 treaty remained viable after the General Allotment Act. In 1901 and 1903, Congress passed legislation expanding the categories of tribal members who were eligible to receive allotments to include women and children on the Bad River, Lac Courte Oreille, and Lac du Flambeau Bands' reservations. Act of Feb. 11, 1901, ch. 350, 31 Stat. 766; Act of Feb. 3, 1903, ch. 399, 32 Stat. 795. Both acts expressly recognized that allotments on those reservations continued to be subject to the 1854 treaty. The 1901 act provided that "such allotments [were] to be subject in all respects, except as to the age and condition of the allottee, to the provisions of the third article of the treaty with the Chippewas of Lake Superior and the Mississippi, concluded September thirtieth, eighteen hundred and fifty-four." The 1903 act included similar language.

Congress also distinguished allotments made under the 1854 treaty from allotments made under the General Allotment Act. A 1914 act directed the Secretary of the Interior to compile a roll of Indians entitled to allotment on the Bad River Band reservation, and then to complete the allotments. The allotments were to be "made in conformity with the provisions of the treaty of September thirtieth, eighteen hundred and fifty-four . . . and subsequent Acts of Congress relating thereto." Act of Aug. 1, 1914, ch. 222, 38 Stat 582, 605. A 1924 act also directed the Secretary of the Interior to compile a roll of those entitled to allotment and to complete the allotments, this time on the Lac du Flambeau Band reservation. But these allotments were to be "in conformity with the provisions of the General Allotment Act of

16

February 8, 1887 . . . the trust patents to said allotments to contain the usual twenty-five year restriction clause as to alienation and taxation." Act of May 19, 1924, ch. 158, 43 Stat. 132. Neither party has identified any allotments that were issued under the 1924 act, but the 1924 act shows that Congress saw both the 1854 treaty and the General Allotment Act as available means of allotting property, and that in its legislation it specified which means it intended to use.

The patents granting allotments—both before and after 1887—stated that the allotment was "as contemplated by the Treaty concluded September 30, 1854 with the Chippewa Indians of Lake Superior." Dkt. 1-4 (May 16, 1878); Dkt. 199-22 (June 20, 1881); Dkt. 199-23 (June 24, 1905); Dkt. 199-24 (June 24, 1905); Dkt. 199-21 (June 29, 1905); Dkt. 199-25 (June 29, 1905); Dkt. 1-5 (October 29, 1914). There is no patent in the record that cites the General Allotment Act as the authority for the allotment.[2]

The state argues that other federal statutes show that Congress intended the General Allotment Act to apply generally to all allotments. The state's best example is a 1902 appropriations amendment that addressed allotments in several reservations in Washington, Nevada, and Utah. After these specific allotment provisions, the act provides:

> Insofar as not otherwise specially provided, all allotments in severalty to Indians, outside of the Indian Territory, shall be made in conformity to the provisions of the [General Allotment Act] and other general Acts amendatory thereof or supplemental thereto, and shall be subject to all the restrictions and carry all the privileges incident to allotments made under said Act and other general Acts amendatory thereof or supplemental thereto.

---

[2] As the tribes note, a patent was issued to Michael Buffalo (Dkt. 199-145) pursuant to a special provision of the 1906 Indian Appropriations Act. That patent did not cite either the 1854 treaty or the General Allotment Act, apparently because the 1906 act provided the pertinent authority.

Act of June 19, 1902, Fifty-Seventh Congress, Sess. 1 Pub. Res. No. 31, 32 Stat. 744. But the court declines to interpret the statement in the 1902 act as broadly as the state urges. The 1902 act includes the exception language "Insofar as not otherwise specially provided." As discussed, after 1902, the President allotted reservation property expressly under the terms of the 1854 treaty. And Congress continued to acknowledge and modify the terms of the 1854 treaty's allotment process in statutes passed after 1902. These statutes and the presidential allotments specifically provided for allotments under the 1854 treaty, so those would be among the exceptions contemplated in the 1902 act. For similar reasons, the court is not persuaded that any of the other statutes cited by the state establish that the General Allotment Act applies to all allotments made after 1887.

The state defendants also contend that *United States v. Payne*, 264 U.S. 446 (1924), shows that all allotments made after the General Allotment Act's passage were made under the General Allotment Act, not under earlier treaties. *Payne* involved a member of the Quileute tribe who sought to compel the federal government to allot him a parcel of timbered land on a Washington reservation under the General Allotment Act. The Supreme Court held that the timbered portions of the reservation could be allotted under the General Allotment Act—despite the statute's restriction to agricultural and grazing land—because the treaty establishing the reservation allowed allotment of all reservation land, including timbered land. The Court determined that the General Allotment Act would control if there were a conflict between the General Allotment Act and the treaty's allotment provisions because the General Allotment Act was the later governmental act. But the Court explained that the General Allotment Act must be "harmonized with the letter and spirit of the treaty" because of the

presumption that Congress will not alter treaty rights without expressly stating its intention to do so. *Id.* at 448.

The reservation in *Payne* was already being allotted under the terms of the General Allotment Act. *See United States v. Mitchell*, 463 U.S. 206, 208 (1983) (describing the history of allotment of the reservation at issue in *Payne*). So the question in that case was whether the federal government could use the General Allotment Act to *deny* a tribal member an allotment of timbered land that was authorized under the treaty. Contrary to the state defendants' characterization of *Payne*, the Court did not hold that all timbered reservation land must be allotted under the General Allotment Act rather than under a treaty. Rather, the Court interpreted the General Allotment Act to preserve the tribe's treaty rights concerning allotment. The state here is attempting what was prohibited in *Payne*: to use the General Allotment Act to eliminate the tribes' treaty-based allotment rights by implication. *Payne* instructs that a construction of the General Allotment Act that would repeal treaty rights by implication "is to be avoided, if possible." *Payne*, 264 U.S. at 449. *Payne* does not support the state's position.

Ultimately, the state's best argument is based on the reasoning of *Yakima*, which is that Congress' unmistakably clear intent to allow state taxation is shown when Congress makes reservation land freely alienable. Some courts have accepted this straightforward logic and held that reservation land made freely alienable, through whatever means, is taxable. *See Lummi Indian Tribe v. Whatcom Cty., Wash.*, 5 F.3d 1355 (9th Cir. 1993), *as amended on denial of reh'g* (Dec. 23, 1993); *Thompson v. Cty. of Franklin*, 314 F.3d 79 (2d Cir. 2002).

But for two reasons the court will follow the approach of *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514 (6th Cir. 2006), which held that the General Allotment Act did not abrogate the tax immunity of land allotted under the 1854 treaty. First, *Naftaly* addresses the

very treaty at issue in this case, the 1854 Treaty of LaPointe. As the state acknowledges in its guidance to municipalities, taxation is tribe- and treaty-specific. Second, *Naftaly* is the better-reasoned decision, with a careful and thorough discussion of the background to the 1854 treaty. As explained above, it was not Congress that authorized the allotment of the property in the plaintiff tribes' reservations; allotment in the Ojibwe reservations was negotiated between the tribes and the United States.

The state has not shown that Congress has expressed, with unmistakable clarity, the intent to tax land that was allotted under the 1854 treaty. Even if tax immunity was not negotiated as an implicit term of the 1854 treaty, Congress remained silent on taxation of the plaintiff tribes' reservations even after the 1887 General Allotment Act because it did not invoke the General Allotment Act with respect to allotment on the tribes' reservations. And the state has certainly not shown that Congress intended to repudiate any tax immunity that was granted to the tribes in the 1854 treaty, which would require an even more pointed expression of congressional intent. Accordingly, the court holds that Indian-owned real property in the tribes' reservations is not taxable by the state or its municipalities—so long as that land has remained in Indian ownership since allotment.

## B.  Exception for Indian-owned property repurchased from non-tribal owners

The parties agree that reservation property owned by non-Indians is taxable by the state. But the state contends that once reservation property goes to non-Indian ownership, that property is forever taxable, even if subsequently repurchased by a tribal owner. And, the state argues, for such Indian-repurchased property, it doesn't matter whether the allotment was originally made under the 1854 Treaty of La Pointe or under the General Allotment Act.

20

The state bases its argument on *Cass County, Minnesota v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103 (1998). The case involved 21 parcels of land that had been purchased by the Leech Band of Ojibwe in an effort to rebuild its reservation land base after it had been radically reduced by allotment to private ownership. Thirteen of the parcels had been allotted to ownership by individual Indians as provided under the General Allotment Act, made applicable to that reservation by the Nelson Act of 1889, ch. 24, 25 Stat. 642. Eight parcels were sold directly to non-Indians as allowed under the Nelson Act. The tribe contended that none of the 21 parcels could be taxed by Cass County, Minnesota. The Court of Appeals for the Eighth Circuit held that the parcels allotted under the General Allotment Act were taxable because Congress had expressly indicated its intent to tax those parcels in the 1906 Burke Act amendment to the General Allotment Act. But the parcels that had been sold to non-Indians would not be taxable because those parcels were not sold under the Burke Act, and the Nelson Act included no expression of intent to tax those parcels should they return to tribal ownership. *Leech Lake Band of Chippewa Indians v. Cass Cty., Minn.*, 108 F.3d 820 (8th Cir. 1997).

The Supreme Court held that all 21 parcels were taxable. The Court noted that the Burke Act expressly provided for taxation of those parcels allotted to Indians. But the Court concluded that the critical factor was free alienability: "When Congress makes Indian reservation land freely alienable, it manifests an unmistakably clear intent to render such land subject to state and local taxation." 524 U.S. at 115. Thus, the parcels sold to non-Indians were also taxable because Congress had made those parcels freely alienable, even though the act that allowed the sale said nothing about taxation.

There is a distinction between the private parcels at issue in *Cass County* and the private parcels at issue in this case. In *Cass County*, it was an act of Congress that initially made the

parcels freely alienable. Here, the initial alienability was the result of the 1854 Treaty of La Pointe. For reasons explained above, land allotted to Indian ownership under the 1854 treaty is not taxable, despite being freely alienable. But it's hard to see how that distinction matters once the property in question is transferred to non-Indian ownership, which all agree makes the property taxable by the state. At that point, the non-Indian owner of the property can claim no rights under the 1854 treaty; the owner then holds title by virtue of the state's ordinary real estate laws. In *Cass County*, the Court explicitly rejected the tribe's argument that "although its tax immunity lay dormant during the period when the eight parcels were held by non-Indians, its reacquisition of the lands in fee rendered them nontaxable once again." 524 U.S. at 113–14. Under *Cass County*, transfer to non-Indian ownership permanently severs the tie between the land and the treaty.

The plaintiff tribes don't have much of an argument on this point. They contend that 1854 treaty allowed the tribes "absolute dominion" over their reservations, including the authority to decide whether whites and "mixed-bloods" would be allowed to live on the reservation. Dkt. 215, at 13. So, the argument goes, the tribes would have had no idea that allowing non-Indians to live on their reservations would compromise the permanency that they had negotiated in the treaty. That's a stretch. Allowing non-Indians to live on the reservation does not compromise any Indian's permanent right to his or her property. But the act of selling that property surrenders that permanent right. And if the purchaser is a non-Indian, all agree that the property becomes taxable. An Indian purchaser who follows a non-Indian owner cannot really claim entitlement to the permanency granted in the 1854 treaty.

The tribes also argue that the Indian Trade and Intercourse Act of 1790 prohibits taxation of Indian-owned reservation property. That act contained a provision known as the

"Nonintercourse Act" prohibiting the transfer of title to land owned by a tribe or individual Indians except by a federally authorized treaty. The restriction on transfers from individual Indians was rescinded in 1834, but the prohibition on transfers of tribe-owned land endures. 25 U.S.C. § 177. It's hard to see how the current Nonintercourse Act would affect land that has been transferred to individual Indian ownership, and the tribes shift and limit their argument in their opposition brief. Dkt. 215, at 24–25. The tribes contend that, as a factual matter, some Indian-owned property has been taxed and then seized for non-payment of those taxes, a practice that would violate the Nonintercourse Act's bar on transferring title out of Indian ownership. But even if the historical taxation and seizure was wrongful, the tribes do not explain how that past wrong would affect the tax status of property that has now returned to private Indian ownership. The argument is stated in a scant couple of sentences, so the court deems it so underdeveloped that it is forfeited. *See Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 538 (7th Cir. 2017).

Ultimately, it's hard to square the plaintiff tribes' position on Indian-repurchased property with the principle in *Cass County* that tax immunity does not lie dormant during periods of non-Indian ownership. The state is entitled to summary judgment that reservation land is taxable once it passes to non-Indian ownership, even if it subsequently returns to Indian ownership.

CONCLUSION

The court will grant both the state's and the tribes' motions for summary judgment in part. Indian-owned real property on the tribes' reservations is not taxable if it has been held in

Indian ownership since allotment; the property is taxable once it passes to non-Indian ownership, even if it subsequently returns to Indian ownership.

The court will enter judgment and close this case, but it will stay enforcement of the judgment for 30 days to give the parties the opportunity to appeal. The court will, if requested, grant a stay pending appeal for any portion of the judgment that is actually appealed.

ORDER

IT IS ORDERED that:

1. Defendants Town of Russell and Jennie Marten's motion to dismiss, Dkt. 116, is DENIED.

2. Defendants Town of Boulder Junction and Paul Carlson's motion to dismiss, Dkt. 132, is DENIED.

3. Defendants Town of Lac du Flambeau and Paul Carlson's motion to dismiss, Dkt. 133, is DENIED.

4. Defendants Town of Sherman and Paul Carlson's motion to dismiss, Dkt. 145, is DENIED.

5. Plaintiffs' motion to amend their complaint, Dkt. 128, is GRANTED. Plaintiffs' claims against defendants Town of Mercer and Paul Carlson in his role as Mercer's assessor are struck from plaintiffs' complaint, Dkt. 1, and dismissed without prejudice.

6. Plaintiffs' motion for summary judgment, Dkt. 156, is GRANTED in part and DENIED in part against all remaining defendants as provided in the opinion.

7. Plaintiffs' request for declaratory relief, Dkt. 1, is GRANTED in part and DENIED in part against all remaining defendants. It is DECLARED that those defendants may not impose state property taxes on Indian-owned reservation property, unless that property has previously been in non-Indian ownership.

8. Plaintiffs' request for a permanent injunction, Dkt. 1, is GRANTED in part and DENIED in part against all remaining defendants. All remaining defendants and their assigns, employees, and agents are enjoined from assessing, collecting, or

24

enforcing Wisconsin property taxes on Indian-owned reservation property, unless that property has previously been in non-Indian ownership.

9. Defendants Tony Evers and Peter Barca's motion for summary judgment, Dkt. 149, is GRANTED in part and DENIED in part as provided in the opinion.

10. Defendants Town of Bass Lake, Town of Hayward, Town of Sanborn, Town of Ashland, Town of White River, Town of Gingles, Scott Zillmer, William Metzinger, Michael Schnautz, Claude Riglemon, and Associated Appraisal Consultants, Inc.'s motion to dismiss, Dkt. 125, and motion for summary judgment, Dkt. 192, are DENIED.

11. Plaintiffs' motion in limine, Dkt. 114, is GRANTED in part and DENIED in part as provided in the opinion; plaintiffs' motion in limine Dkt. 217, and motions to strike, Dkt. 205 and Dkt. 226, are DENIED.

12. The clerk of court is directed to enter judgment as provided here and close this case.

13. The court will stay enforcement of the judgment for 30 days to allow the parties to appeal.

Entered April 9, 2021.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge